**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 25-CV-25063-BLOOM/Elfenbein

**ALEXANDER RUDNITSKY**,

      Plaintiff,

 v.

**INTERNATIONAL CHECKERS**
**ASSOCIATION OF NORTH**
**AMERICA INC.**, *et al*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON MOTION TO DISMISS

**THIS CAUSE** is before the Court on Defendants International Checkers Association of North America, Inc. ("ICAONA") and Lyublyana K. Turiy's ("Turiy," and collectively, "Defendants") Motion to Dismiss Plaintiff's Complaint (the "Motion to Dismiss"). *See* ECF No. [17]. The Honorable Beth Bloom referred the Motion to Dismiss to me for a Report and Recommendation. *See* ECF No. [28]. For the reasons explained below, I respectfully **RECOMMEND** that the Motion to Dismiss, **ECF No. [17]**, be **GRANTED in part and DENIED in part**.

## I.    BACKGROUND

Plaintiff Alexander Rudnitsky ("Plaintiff" or "Rudnitsky") brings this action against ICAONA and Turiy alleging "unlawful disqualification" from competitive checkers tournaments, "dissemination of defamatory statements, adoption of discriminatory membership and tournament rules, and abuse of nonprofit authority," all in violation of Florida and federal law. *See* ECF No. [1] at ¶2. He seeks $580,000 in compensatory and punitive damages, as well as injunctive and

declaratory relief rescinding his suspension, restoring his eligibility to participate in all World Draughts Federation ("FMJD") sanctioned competitions, including the U.S. Championship and U.S. Open, and compelling the withdrawal of all defamatory statements made to FMJD and third parties. *See id*. at ¶71, p. 40-41. Plaintiff alleges that he is a five-time U.S. National Champion and two-time World Veterans Champion in the game of checkers. *Id*. at ¶¶1, 3. According to the Complaint, he was "an integral part and a driving force" in establishing ICAONA in 2002 and served as its Vice President until March 2024, after which time he remained a member. *Id*. at ¶¶11, 12. Plaintiff also alleges he is "one of the founders of the National Draughts Federation of the USA ('NDF'), a nonprofit organization dedicated to promoting draughts in the United States, including organizing the Miami Open 2025 [("Miami Open")]." *See id*. at ¶¶1, 14.

ICAONA is a New York not-for-profit foundation headquartered in Huntington, New York, led by Executive Director Turiy and president Rudi Azimullah ("Azimullah"). *Id*. at ¶4. Turiy is a New York resident who has been an ICAONA member since 2002, has served on its Board of Directors in various capacities, and has, according to Plaintiff, effectively led ICAONA and controlled its decision-making since 2009. *See id*. at ¶¶5, 45. From the outset, NDF and Rudnitsky expressly acknowledged ICAONA's status as the FMJD-recognized U.S. member federation. *See id*. at ¶15. FMJD issued multiple letters of support to Rudnitsky and Miami Open, confirming that NDF operated entirely within the FMJD framework. *Id*. at ¶18.

Rudnitsky alleges that ICAONA's response to the emergence of NDF was a coordinated campaign of suppression that Turiy orchestrated. *See id*. at ¶¶47, 50. On November 13, 2024, Turiy transmitted a letter to FMJD's Tournament Director accusing Rudnitsky and NDF of "forgery of signatures," "fraud," and "falsification and deception" in connection with the Miami Open. *See id*. at ¶¶48, 74, 97. As FMJD's Tournament Director informed Rudnitsky on December

10, 2024, that letter directly caused FMJD to remove Miami Open from its official tournament calendar. *Id*. at ¶75. By that time, contracts had already been signed with hotels and the playing hall with significant deposits paid, advertising agreements were in place with a local magazine, invitations had been sent to players and national federations with visa support letters, and a $9,000 prize fund had been established. *See id*. at ¶¶78, 79. On January 17, 2025, further defamatory statements emerged in chat communications in which Turiy accused Rudnitsky, the NDF President, and the FMJD President of "corruption" and proposed that Rudnitsky be disqualified to prevent his participation in the World Championship Final. *See id*. at ¶80.

On March 3, 2025, the FMJD Executive Board convened a meeting with representatives of both ICAONA and NDF, confirmed that Rudnitsky had consistently recognized ICAONA's FMJD status, and rejected ICAONA's contrary claims. *Id*. at ¶¶20, 51. Azimullah subsequently wrote to Rudnitsky stating he would not interfere with Miami Open 2025. *Id*. at ¶22. Rudnitsky alleges that ICAONA nonetheless reversed course under Turiy's pressure. *Id*. at ¶55.

On April 5, 2025, ICAONA amended its bylaws for the first time since 2002. *See id*. at ¶¶23-25. Rudnitsky alleges the amendments were adopted without a quorum, without proper notice or discussion, without minutes being made available, and with only eight members present. *See id*. at ¶¶25, 52, 53, 54. The amendments restricted membership to U.S. citizens and permanent residents and conditioned participation in FMJD-sanctioned tournaments on ICAONA membership and payment of dues. *See id*. at ¶¶24, 26. ICAONA applied the amended bylaws immediately, requiring all U.S. Open 2025 participants to hold ICAONA membership as a condition of competing. *See id*. at ¶26.

On May 15, 2025, ICAONA issued Rudnitsky a written warning, which was followed by a two-year suspension with the threat of a permanent lifetime ban a few weeks later. *See id*. at

¶¶32, 36.  The stated ground was that Rudnitsky had created NDF in a manner that allegedly undermined ICAONA's role as the FMJD-recognized national federation and had publicly denied ICAONA's status as the sole legitimate FMJD member in the United States.  *See id*. at 33. Rudnitsky alleges these charges were baseless, that the suspension was imposed without notice, without an opportunity to be heard, and without any record of the vote being made available to him.  *See id*. at ¶¶34, 35, 36, 56.  On October 1, 2025, the FMJD Ethics Committee unanimously found ICAONA's suspension unlawful, annulled the disqualification, and ordered ICAONA to immediately restore Rudnitsky's eligibility for all FMJD-sanctioned competitions.  *See id*. at ¶¶60, 61.  The Ethics Committee reaffirmed that ruling in a supplementary report to the 41st FMJD General Assembly on October 24, 2025, which was further endorsed at the General Assembly in Turkey on October 26, 2025.  *See id*. at ¶¶59, 188.

With that unexecuted reinstatement order in place, ICAONA organized and hosted the US Open 2025 — the qualifying event for the Pan-American Championship 2026 and the World Championship 2027 — in Miami Beach, Florida, from November 21 through 30, 2025.  *See id*. at ¶¶40, 161.  Rudnitsky alleges ICAONA organized the Championship to be held in Miami Beach and that Defendants intentionally orchestrated and implemented his exclusion from that Florida competition.  *See id*. at ¶¶6, 7.  Turiy, who resides in Huntington, New York, is alleged to have been the driving force behind the tortious decisions culminating in Rudnitsky's exclusion from the Miami Beach Championship.  *See id*. at ¶8.

Based on these allegations, Rudnitsky brings ten counts: Defamation (Count I); Tortious Interference with Business Relationships (Count II); Breach of Fiduciary Duty (Count III); Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count IV); Civil Conspiracy (Count V); Violation of Sections 1 and 2 of the Sherman Act (Count VI); Breach of

Contract and Violation of Member's Rights (Count VII); Declaratory Relief (Count VIII); Injunctive Relief (Count IX); and Severe Emotional Distress (Count X). *See id*. at ¶¶72–207.

On December 15, 2025, Defendants filed their Motion to Dismiss the Verified Complaint in its entirety. *See* ECF No. [17]. Defendants first argue that the Complaint is an improper shotgun pleading that violates Federal Rules of Civil Procedure 8 and 10, spanning more than 120 pages, incorporating all 71 factual paragraphs into each of the ten counts, and forcing Defendants to guess which factual allegations relate to which cause of action. *See id*. at 1. Defendants next argue that this Court lacks subject-matter jurisdiction on both available grounds. *See id*. at 2-4. As to diversity jurisdiction, Defendants contend that Rudnitsky's alleged damages — consisting of reputational injury, lost business opportunities, and other consequential damages — are speculative, conclusory, and not legally recoverable, and therefore cannot satisfy the $75,000 amount-in-controversy requirement. *See id*. at 2–3. As to federal question jurisdiction, Defendants argue that the Sherman Act does not alone create a private right of action and that the Complaint fails to allege the indispensable elements of a Sherman Act claim — a relevant market, market power, and antitrust injury. *See id*. at 3–4. Defendants correctly state that the Court's Order Denying Plaintiff's Motion for Temporary Restraining Order ("Order Denying the TRO") found that Rudnitsky lacked standing to bring a Sherman Act claim because "[t]he Sherman Act does not alone create a private right of action[,]" and argue that this ruling is dispositive as to subject-matter jurisdiction. *See id*. at 4 (quoting ECF No. [11] at 3).

Defendants further argue that this Court lacks personal jurisdiction over Turiy. Defendants contend that Rudnitsky's allegations amount to no more than conclusory assertions that Turiy was the "driving force" behind decisions that harmed a Florida resident, which the Eleventh Circuit has held is insufficient to establish personal jurisdiction over a nonresident defendant. *See id*. at

4–5. Defendants aver that the Complaint alleges no specific acts by Turiy occurring in Florida, no tortious conduct committed by Turiy in Florida, and no purposeful availment of the Florida forum by Turiy. *See id*. at 5. Defendants also argue that venue in the Southern District of Florida is improper because both Defendants reside in New York, ICAONA is headquartered in New York, and all decisions, communications, and actions giving rise to the claims occurred in New York rather than in Florida. *See id*. at 5–6.

As to the merits of the individual counts, Defendants argue that Plaintiff fails to state a claim as to defamation, tortious interference, breach of fiduciary duty, FDUTPA, civil conspiracy, the Sherman Act, and breach of contract. *See id*. at 6-11. Regarding defamation, Defendants contend that Rudnitsky fails to identify any defamatory statement with the specificity required under Florida law — including the exact words used, the speaker, the recipient, the date, and an explanation of why the statement is false — and that the alleged communications fall within a qualified privilege applicable to statements made in good faith within an organizational governance context. *See id*. at 6–7. As to tortious interference, Defendants argue that Rudnitsky identifies only vague groups of alleged third-party relationships — such as "sponsors," "players," and "coaches" — without naming a single individual, contract, or specific third-party commitment, and that the Complaint's own paragraphs contradict one another as to the nature and existence of the alleged business interference. *See id*. at 7–9. On breach of fiduciary duty, Defendants contend the count contains only an array of conclusory allegations that fail to state the required elements of duty, breach, and proximate cause. *See id*. at 9. Regarding the FDUTPA claim, Defendants argue the statute does not apply because the allegations concern a nonprofit's internal membership eligibility and disciplinary decisions, which do not constitute "trade or commerce" within the meaning of Fla. Stat. § 501.203(8). *See id*. at 9–10. As for civil conspiracy, Defendants contend

the count fails because Rudnitsky has not stated a claim for relief on any of the underlying torts. *See id*. at 10.  On the Sherman Act claim, Defendants repeat their jurisdictional argument and contend that the Complaint fails to plead the elements necessary to sustain a private antitrust claim for relief.  *See id*. at 10–11.  Finally, as to breach of contract, Defendants state that Rudnitsky identifies no specific contract, essential terms, or manner of breach, and that organizational bylaws do not automatically constitute enforceable contracts between a nonprofit and its members.  *See id*. at 11.

On January 7, 2026, Rudnitsky filed his Memorandum in Opposition (the "Response"). ECF No. [23].  As a threshold matter, Rudnitsky argues that Defendants failed to challenge Counts VIII, IX, and X, and that those counts should be deemed uncontested.  *See id*. at 1.  On subject-matter jurisdiction, Rudnitsky argues that his alleged damages plausibly exceed $75,000 and that, where injunctive relief is sought, the amount in controversy is measured by the value of the right to be protected from the plaintiff's perspective.  *See id*. at 3.  As to federal question jurisdiction, Rudnitsky argues that Defendants fundamentally misstate the law: the Sherman Act and Clayton Act operate together, with Sections 4 and 16 of the Clayton Act expressly supplying the private right of action that the Sherman Act's substantive prohibitions alone do not contain.  He further explains that the Order Denying the TRO based on standing was a preliminary, non-merits determination that does not control the Rule 12(b)(6) analysis.  *See id*. at 3–4.

Regarding personal jurisdiction over Turiy, Rudnitsky invokes the *Calder* effects test, arguing all three prongs are satisfied: Turiy engaged in intentional conduct by authoring the November 2024 FMJD letter and coordinating the disqualification campaign; her conduct was expressly aimed at Florida-based events and relationships; and the harm was foreseeable and realized in Florida.  *See id*. at 4–6.  Rudnitsky further contends that Turiy was physically present

in Miami Beach on November 21, 2025, personally enforcing Rudnitsky's exclusion from the U.S Open 2025, and that her physical presence in Florida independently establishes jurisdiction.[1] *See id*. at 6. Rudnitsky further argues that Turiy was not a mere functionary acting at the direction of others, but rather acted with autonomous authority and personal discretion — simultaneously holding the roles of ICAONA Executive Director, Chief Arbiter of the US Open 2025, and FMJD Director of Tournaments, giving her direct and decisive personal control over Rudnitsky's access to competition, which she exercised independently and deliberately.[2] *See id*. at 6. As to venue, Rudnitsky argues that the core tortious act — his final and physical exclusion from the U.S Open 2025 — occurred in Miami Beach, establishing that this District is an appropriate venue. *See id*. at 8–9.

On the merits, Rudnitsky argues that each count is adequately pled. Starting with defamation, Rudnitsky identifies three discrete defamatory acts with the requisite specificity — speaker, recipient, content, date, falsity, and harm — and argues that accusations of forgery, fraud, and financial misconduct constitute defamation *per se*, defeating any qualified privilege defense where actual malice is alleged. *See id*. at 9–10. As to tortious interference, Rudnitsky identifies concrete business relationships with FMJD, donors, sponsors, hotel and vendor contractors, and international players, arguing Florida law requires no formal contract and that ICAONA's

---

[1] Plaintiff cites to exhibits in his Response but fails to attach any exhibits to his response. *See generally* ECF No. [23]. For this particular proposition, Plaintiff cites to "Exhs #21, #21.1[.]" *See id*. at 5. The Court presumes that Plaintiff is referring to his Affidavit filed at ECF No. [24]. Even if that is correct, there is no "Exh. 21.1" attached thereto. Nor does Exhibit 21 support the position for which Plaintiff cites it. *See* ECF Nos. [24-21] and [24-25]. Additionally, the Complaint's exhibits do not seem to support this position either and Plaintiff does not cite them in any event. *See generally id*.

[2] On personal jurisdiction over ICAONA, Rudnitsky devotes over two pages of his Response to arguing that personal jurisdiction exists over ICAONA. *See id*. at 6–9. Defendants, however, do not challenge personal jurisdiction over ICAONA in their Motion to Dismiss, rendering those arguments unnecessary to resolve. The Court need not address this argument.

interference through false statements and coercive exclusion was intentional and unjustified. *See id*. at 11–12. On breach of fiduciary duty, Rudnitsky contends that ICAONA's exclusive gatekeeper authority over championship access created a relationship of justified reliance that was systematically breached through the misuse of regulatory authority to eliminate him from the market. *See id*. at 12–13. Turning to the FDUTPA claim, Rudnitsky argues the statute applies because ICAONA operated in a sports services market within the meaning of Fla. Stat. § 501.203(8), and he identifies five specific unfair and deceptive practices including false accusations to FMJD, discriminatory disqualification, anti-competitive tournament rules, and coercive ultimatums conditioning competition access on withdrawal of this lawsuit. *See id*. at 13–15. As for his claims for civil conspiracy, Rudnitsky argues that an agreement between ICAONA and Turiy may be inferred from a continuous sequence of coordinated acts spanning from November 2024 through Rudnitsky's physical exclusion on November 21, 2025. *See id*. at 15–16. Addredding his Sherman Act claims, Plaintiff argues that the Clayton Act supplies a private right of action for Sherman Act claims. *See id*. at 16. Rudnitsky defines the relevant product market as the market for international draughts sports services and the geographic market as Florida, alleges that ICAONA's prolonged exclusive FMJD recognition supports an inference of monopoly power, and contends that his removal as founder and organizer of the only competing organization constitutes a classic antitrust injury. *See id*. at 17–18. Finally, as the claim for breach of member's rights, Rudnitsky concedes the bylaws may not constitute an enforceable contract but argues that this subjects them to federal regulatory and antitrust scrutiny as instruments of market regulation rather than shielding them from judicial review. *See id*. at 18–20.

Defendants timely filed their Reply, which is very brief. *See* ECF No. [27]. Therein Defendants advance a single overarching position: that Plaintiff's Response improperly relies on

new factual assertions, declarations, and affidavits outside the four corners of the Complaint, which cannot be considered under Rule 12(b)(6), and that the Court should therefore disregard all extraneous material in the Response and evaluate the Motion to Dismiss based solely on the deficiencies present in the Complaint itself. *See id*. at 1–2. Defendants renew their request for dismissal of the Complaint in its entirety, or they alternatively request — for the first time — summary judgment in their favor. *See id*. at 2.

## II.   LEGAL STANDARDS

### A.   Subject-Matter Jurisdiction

"Federal courts are courts of limited subject-matter jurisdiction." *Hensley v. Hartford Cas. Ins. Co.*, 113 F.4th 1327, 1332 (11th Cir. 2024) (quotation marks omitted). "A district court can hear a case only if it has at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)." *Id.* (quotation marks omitted). At issue here is federal question jurisdiction under § 1331 and diversity jurisdiction under § 1332(a).

### 1.   Federal Question

Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A case "arises under" federal law when a federal question appears on the face of the plaintiff's well-pleaded complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Federal jurisdiction exists so long as the federal claim asserted is not "wholly insubstantial" or "frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946). Where a plaintiff invokes a federal statute as the basis for subject-matter jurisdiction, the court must determine whether that statute actually confers a private right of action. The absence of a valid cause of action does not implicate subject-matter jurisdiction — that is, a

court's statutory or constitutional power to adjudicate the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002). A court has jurisdiction so long as the plaintiff's right to recover will be sustained under one construction of federal law, unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *See Verizon*, 535 U.S. at 643 (quoting *Steel Co.*, 523 U.S. at 89). Accordingly, a court should not conflate the question of whether a federal statute supplies a private right of action with the threshold question of whether the court has subject-matter jurisdiction to consider the claim at all. *See Verizon*, 535 U.S. at 643; *Steel Co.*, 523 U.S. at 89.

### 2.      Diversity Jurisdiction

Federal diversity jurisdiction requires, among other things, that the amount in controversy exceed $75,000. 28 U.S.C. § 1332. "Federal courts are courts of limited jurisdiction," and the court is obligated to satisfy itself that the requisite amount in controversy is present. *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). A case filed under diversity jurisdiction alleging the requisite amount in  controversy "will not be dismissed unless it appears to a 'legal certainty' that plaintiff's claim is actually for less than the jurisdictional amount." *Id*. at 1094 (quoting *St. Paul's Indem. Corp. v. Red Cab Co.,* 303 U.S. 283, 288–289 (1938)). At the pleading stage, a court accepts the plaintiff's alleged amount in controversy as sufficient so long as it is claimed in good faith and is not legally impossible. *See id*; *St. Paul*, 303 U.S. at 288–89. Where a plaintiff seeks injunctive or declaratory relief, the amount in controversy is measured by the monetary value of the object of the litigation from the plaintiff's perspective. *See Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1077 (11th Cir. 2000).

**B.      Personal Jurisdiction**

Federal Rule of Civil Procedure 12(b)(2) states that a defendant may move to dismiss a claim against it for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir.1999)).  A prima facie case requires enough evidence to withstand a motion for directed verdict. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990).  "When a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) (quoting *Madara*, 916 F.2d at 1514).  This burden, however, "does not shift back shift back to the plaintiff when 'the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction.'" *Id*. (quoting *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir.2006)).

"Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Giuliani v. NCL (Bahamas) Ltd.*, 558 F. Supp. 3d 1230, 1236 (S.D. Fla. 2021) (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010)).  In that scenario, the court "still must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits." *Id*. (quoting *Madara*, 916 F.2d at 1514).  Still, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or

other competent proof and not merely reiterate the factual allegations in the complaint." *See Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968 (11th Cir. 1986).

A federal court siting in diversity undertakes a two-step analysis to determine whether there is personal jurisdiction over a nonresident defendant. *United Techs.*, 556 F.3d 1260 at 1274. Jurisdiction must: (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment. *See id*. Accordingly, the court must determine whether the nonresident defendant has such minimum contacts with the forum state such that exercising personal jurisdiction does not offend the traditional notions of fair play and substantial justice. *See Mut. Servs. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312 (11th Cir. 2004).

The Florida long-arm statute provides for both specific and general jurisdiction. Specific jurisdiction can be met under Fla. Stat. § 48.193(1)(a)(1)-(9) by alleging facts supporting any of the enumerated acts in the subsections of the statute. Specific personal jurisdiction authorizes jurisdiction over causes of action arising from a defendant's actions within Florida and concerns a foreign defendant's contacts with Florida only as they relate to a specific cause of action. *See Giuliani*, 558 F. Supp. 3d at 1237 (citation omitted). "Establishing one of the Florida long-arm statute's enumerated acts alone is not enough to satisfy the Florida statute." *See SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227–28 (11th Cir. 2023). The statute additionally requires a connection, termed the "connexity requirement," "between the enumerated activity in Florida and the plaintiff's cause of action." *Id*. at 1228 (citing *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1292 (11th Cir. 2022)).

General jurisdiction under Fla. Stat. § 48.193(2) can be satisfied by establishing that a defendant engages in "substantial and not isolated activity" in the state. *See Carmouche v. Tamborlee Mgmt., Inc.,* 789 F.3d 1201, 1204 (11th Cir. 2015). And Florida's long-arm statute is

to be strictly construed. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623 (11th Cir. 1996). If either specific or general jurisdiction is satisfied under the long-arm statute, the court must conduct an inquiry into whether the Due Process Clause of the Fourteenth Amendment is satisfied. *See Ferenchak v. Zormati*, 572 F. Supp. 3d 1284 (S.D. Fla. 2021).

The Due Process Clause analysis requires an examination of three factors: (1) the defendant's purposeful availment of the forum state; (2) the cause of action arising out of the activities of which the defendant purposefully availed herself; and (3) reasonable foreseeability of the defendant being haled into court in the forum state. *Id*. at 1287. Besides examining these factors, a court must determine whether exercising jurisdiction will comport with traditional notions of fair play and substantial justice. *Id*. To do so, a court must balance the following five factors: (1) burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantial social policies. *Id*. (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Both the state long-arm statute and the Due Process Clause of the Fourteenth Amendment must be satisfied for a federal court to have personal jurisdiction over a nonresident defendant. *See Madara*, 916 F.2d at 1514 ("[o]nly if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant.").

### C.    Venue

The federal venue statute gives three instructions about where a party may bring a "civil action." *See* 28 U.S.C. § 1391(b). First, the party may file his lawsuit in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is

14

located." *See* 28 U.S.C. § 1391(b)(1). Second, the party may file his lawsuit in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." *See* 28 U.S.C. § 1391(b)(2). Third, "if there is no district in which an action may otherwise be brought," the party may file his lawsuit in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *See* 28 U.S.C. § 1391(b)(3). And for "all venue purposes," a natural person is "deemed to reside in the judicial district in which that person is domiciled." *See* 28 U.S.C. § 1391(c)(1).

If the party files his lawsuit "in the wrong division or district," a court "shall dismiss" it or, "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *See* 28 U.S.C. § 1406(a). There are, of course, "some cases in which venue will be proper in two or more districts." *See Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). But when determining which district or districts are proper for venue purposes, "[o]nly the events that directly give rise to a claim are relevant." *Id.* "And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Id.* (quoting 28 U.S.C. § 1391(a)(2)).

**D.      Motion to Dismiss Under 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b), a party may move to dismiss a claim on several bases, including a "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration

adopted, quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation and footnote omitted).  A complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration adopted, quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and quotation marks omitted).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (alteration adopted, citation and quotation marks omitted).

"Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductible therefrom, but need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by a party." *Campos v. INS*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998); *see also Ellen S. v. Fla. Bd. of Bar Exam'rs*, 859

16

F. Supp. 1489, 1492 (S.D. Fla. 1994) (noting that there "are a few exceptions to" the rule requiring courts to accept a complaint's allegations as true, "such as where the facts alleged are internally inconsistent or where they run counter to facts of which the court can take judicial notice"). When performing this analysis, the court may consider the complaint itself along with any "documents attached to" it "or incorporated in the complaint by reference." *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014).

### E. Substantive Law of the Claims and Defenses

#### 1. Defamation (Count I)

"To prove defamation under Florida law, a plaintiff must establish the following elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105–06 (Fla. 2008)). Put another way, "defamation is generally defined as the unprivileged publication of false statements which naturally and proximately result in injury to another." *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1317 (S.D. Fla. 2020) (quotation marks omitted).

"Words are defamatory under Florida law when they tend to subject one to hatred, distrust, ridicule, contempt or disgrace;" "to injure one in one's business or profession;" or "to deter third persons from associating or dealing with him." *Johnston*, 36 F.4th at 1275, 1285 (quotation marks omitted); *see also Bongino*, 477 F. Supp. 3d at 1317 (noting a "defamatory statement 'tends to harm the reputation of another by lowering him or her in the estimation of the community'" (quoting *Rapp*, 997 So. 2d 1108–09)). "Even if the words are not literally false, they may still be defamatory if the defendant juxtaposes a series of facts so as to imply a defamatory connection

17

between them, or creates a defamatory implication by omitting facts." *Johnston*, 36 F.4th at 1275 (quotation marks omitted).  On the other hand, "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).

"In determining whether language is defamatory under Florida law, the publication made should be construed as the common mind would understand it, and not in their mildest or most grievous sense." *Johnston*, 36 F.4th at 1275 (alteration adopted, quotation marks omitted).  "The publication must also be considered in its totality and in context rather than piecemeal and in isolation." *Id.* (quotation marks omitted).  Publication, in this context, "is communication of the statement to a third person." *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119–20 (S.D. Fla. 2021) (quotation marks omitted).  "Where a statement is subject to two possible interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory." *Johnston*, 36 F.4th at 1275.  Further, it "is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended.  Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody." *See id.* at 1276 (citation and quotation marks omitted).

### 2. Tortious Interference (Count II)

"To prevail on a claim of tortious interference with a business relationship under Florida law, a plaintiff must establish four elements: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant;

18

and (4) damage to the plaintiff as a result of the breach of the relationship."[3]  *Pilkington v. United Airlines*, 112 F.3d 1532, 1540 (11th Cir. 1997); *see also Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994).  "Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action."  *Pilkington*, 112 F.3d at 1540; *see also Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).  "The only material difference appears to be that in one there is a contract and in the other there is only a business relationship."  *Pilkington*, 112 F.3d at 1540; *see also In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1200 n.22 (S.D. Fla. 2022).

As a result, to state the first element of a tortious interference with a business relationship claim, a plaintiff "need not allege the existence of an enforceable contract."  *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1279 (11th Cir. 2015).  Instead, that claim "generally requires an understanding between the parties that would have been completed had the defendant not interfered."  *See Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (alteration adopted, quotation marks omitted); *Ethan Allen*, 647 So. 2d at 815 (noting the business relationship must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed" but for the interference).  The business relationship "must afford the plaintiff existing or prospective legal" rights and be "with

---

[3] Historically, there has been some variation in how courts have set out the elements of tortious interference claims. While some courts have framed those claims as requiring the four elements listed above, other courts have separated the test into five elements: (1) the existence of a contract or business relationship; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional procurement of the contract's breach or interference with the business relationship; (4) the absence of any justification or privilege; and (5) damages resulting from the breach. *See ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1348–49 (11th Cir. 2025) (contract); *Glob. Marine Expl., Inc. v. Republic of France*, ___ F.4th ___, No. 24-10148, 2025 WL 2394694, at *12 (11th Cir. Aug. 19, 2025) (business relationship).  Regardless of how many elements it includes, the test undoubtedly requires an allegation that the defendant acted without justification. *See Glob. Marine*, 2025 WL 2394694, at *12 (noting plaintiff must "allege that the defendant acted without justification" (quotation marks omitted)).

present or prospective customers," as "no cause of action exists for tortious interference with a business's relationship to the community at large." *Ethan Allen*, 647 So. 2d at 814–15; *see also Future Tech Int'l, Inc. v. Tae Il Media, Ltd.*, 944 F. Supp. 1538, 1570 (S.D. Fla. 1996). By contrast, and unsurprisingly, to state the first element of a tortious interference with a contract claim, a plaintiff must allege the "existence of a contract." *Johnson Enters.*, 162 F.3d at 1321; *see also AMG Trade & Distrib., LLC v. Nissan N. Am., Inc.*, No. 18-CV-60062, 2019 WL 11583368, at \*3 (S.D. Fla. May 17, 2019), *aff'd*, 813 F. App'x 403 (11th Cir. 2020); *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla. 1st DCA 2015).

As to the second element, a defendant's knowledge of the business relationship or contract, the Eleventh Circuit has characterized it as "self-explanatory."[4] *Duty Free*, 797 F.3d at 1279. Even so, the Court has also explained the knowledge element "need not [be] pled . . . with specificity." *See Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018). That is because "a tortious interference claim is not subject to a heightened pleading standard," *ThermoLife Int'l LLC v. Vital Pharms. Inc.*, No. 19-CV-61380, 2020 WL 409594, at \*3 (S.D. Fla. Jan. 24, 2020), and Rule 9 allows "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally," Fed. R. Civ. P. 9(b). Because of this "relaxed pleading standard with respect to knowledge," courts in this District have found tortious interference claims to survive motions to dismiss even when the allegations of "knowledge of the contracts and business relationships" have been "short on detail." *See Palm Springs*, 2020 WL 7711687, at \*4.

Whether a tortious interference claim can survive a motion to dismiss most often turns on

---

[4] The Eleventh Circuit has said the same thing about the damages element. *See Duty Free*, 797 F.3d at 1279. Courts that have further analyzed that element have explained that an allegation the plaintiff "suffered damages is sufficient at [the motion-to-dismiss] stage." *Palm Springs Mile Assocs., Ltd. v. T-Mobile USA, Inc.*, No. 20-CV-22841, 2020 WL 7711687, at \*4 (S.D. Fla. Dec. 29, 2020).

20

the third element, which requires a defendant's interference with the business relationship or contract to be intentional and unjustified. On that element, courts uniformly recognize that a plaintiff must "allege that the defendant acted without justification." *See Glob. Marine*, 2025 WL 2394694, at *12 (quotation marks omitted); *ECB USA*, 148 F.4th at 1349 (requiring allegations of the "absence of any justification or privilege" for tortious interference with a contract (alteration adopted)).   "This is a fact-intensive inquiry that requires an examination of the defendant's conduct, its motive, and the interests it sought to advance." *Duty Free*, 797 F.3d at 1280 (quotation marks omitted).

At the same time, courts have recognized that a similar concept — a defendant's assertion of privilege to interfere — is an affirmative defense that is premature at the motion-to-dismiss stage. *See, e.g.*, *de Cortes v. Brickell Inv. Realty, LLC*, 546 F. Supp. 3d 1332, 1345 (S.D. Fla. 2021). Given the factual similarity of the without-justification element and the privilege affirmative defense, courts have acknowledged that "[w]hether the plaintiff must prove lack of justification or the defendant must prove justification is an unsettled issue in Florida." *See Peacock v. Gen. Motors Acceptance Corp.*, 432 So. 2d 142, 145 n.1 (Fla. 1st DCA 1983); *Austral Insulated*, 262 F.3d at 1158 (noting "which party bears the burden of persuasion" on whether a defendant's "actions are protected by the privilege of competition" is "far from clear"); *Berkley Ins. Co. v. Banc of Am. Cmty. Dev. Co., LLC*, 386 So. 3d 623, 625 (Fla. 2d DCA 2024); *cf. Glob. Marine*, 2025 WL 2394694, at *12 ("A defendant does not act without justification if he has the privilege of interference." (citations and quotation marks omitted)).

Though it explicitly declined to decide the issue, the Eleventh Circuit has noted Florida "apparently places the burden on the plaintiff to show unjustified interference, but then requires the defendant to prove that the interference was lawful" — or, stated another way, "once the

21

plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to justify the propriety of its conduct."[5]  *Austral Insulated*, 262 F.3d at 1158–59 (quotation marks omitted). Still, "when courts talk about a party's act as unjustified or unlawful, they essentially are talking about the same thing."  *Id.* at 1158 (quotation marks omitted).  For that reason, many courts have declined to dismiss tortious interference claims based on the justification/privilege component. *See, e.g.*, *Peacock*, 432 So. 2d at 144–45 ("[W]ithout undertaking on this record to state definitively where counterclaimants' burden to allege unjustified interference ends and where [the defendant's] burden to allege its privilege begins, we conceive that the complaint alleges tortious conduct . . . sufficiently to withstand a motion to dismiss." (footnotes and quotation marks omitted)); *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1239 (S.D. Fla. 2015); *de Cortes*, 546 F. Supp. 3d at 1345.  Instead, courts have opined that, unless "the defense clearly appears on the face of the complaint," *see Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), "the applicability of [the defendant's] 'privilege of interference' affirmative defense would be best determined at summary judgment or trial," *see BOF Med. Ctr., Inc. v. CVS Pharmacy, Inc.*, No. 23-CV-24438, 2024 WL 1908616, at *3 (S.D. Fla. Apr. 30, 2024).

### 3.   Breach of Fiduciary Duty (Count III)

In Florida, "[b]reach of fiduciary duty requires proof of (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach."  *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1338 (S.D. Fla. 2011), *aff'd*, 483 F. App'x 568 (11th Cir. 2012) (citation omitted); *see Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002) ("The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the

---

[5] If the defendant carries its burden to show privilege, the "burden to defeat the privilege then shifts" back "to the party that brought the tortious interference claim to show improper means were employed." *See Glob. Marine*, 2025 WL 2394694, at *13 (quotation marks omitted).

breach of that duty such that it is the proximate cause of the plaintiff's damages." (footnote call number omitted)). "A fiduciary relationship exists [in Florida] when there is a relationship of trust and confidence between parties, where confidence is given by one and trust is accepted by the other." *See Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000) (citation omitted). Whether fiduciary duties were created between two parties is a question of fact." *Swerhun v. Gen. Motors Corp.*, 812 F. Supp. 1218, 1223 (M.D. Fla. 1993) (citations omitted).  A plaintiff alleging a breach of fiduciary duty "must bring forth substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." *Id.* (citations omitted).

### 4.  FDUTPA (Count IV)

"To assert a claim under FDUTPA, a plaintiff must allege (1) a deceptive or unfair act in the conduct of trade or commerce; (2) causation; and (3) actual damages." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023) (citing *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073 (Fla. 5th DCA 2008)).  "An unfair practice is 'one that offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quoting *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So. 2d 489, 499 (Fla. 4th DCA 2001)) (internal quotations omitted).  FDUTPA damages are measured by the difference in market value between what was received and what should have been received.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (quoting *Rollins, Inc. v. Heller,* 454 So. 2d 580, 585 (Fla. 3d DCA 1984)).  "For purposes of recovery under FDUTPA, 'actual damages' do not include consequential damages." *Id*. (quoting *Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311, 314 (Fla. 4th DCA 1998)).

23

### 5. Civil Conspiracy (Count V)

"To establish a civil conspiracy claim, [a plaintiff] must plead sufficient facts that show (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy." *ECB USA*, 148 F.4th at 1347 (quotation marks omitted); *see also Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014); *GE Real Est. Servs., Inc. v. Mandich Real Est. Advisors, Inc.*, 337 So. 3d 416, 420 (Fla. 3d DCA 2021). An "allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to" support a conspiracy claim. *See Twombly*, 550 U.S. at 556–57; *Alhassid*, 60 F. Supp. 3d at 1319.

"General allegations of conspiracy are inadequate." *Mandich*, 337 So. 3d at 420 (citation omitted). To survive a motion to dismiss, the "complaint must set forth clear, positive, and specific allegations of civil conspiracy." *See id.* (quotation marks omitted). "To assume or speculate" that defendants "participated in a conspiracy merely because they ultimately received some benefits from" the scheme "is insufficient for the imposition of liability against them." *Id.* at 421 (alteration adopted, quotation marks omitted).

Florida law does not generally recognize "an independent cause of action for civil conspiracy; rather, the plaintiff must allege an underlying illegal act or tort on which conspiracy is based."[6] *Alhassid*, 60 F. Supp. 3d at 1316; *see also Walters*, 931 So. 2d at 140. "The gist of a

---

[6] There is one situation in which Florida has recognized an "independent civil conspiracy tort claim," *see Walters v. Blankenship*, 931 So. 2d 137, 144 (Fla. 5th DCA 2006) (Lawson, J., dissenting), and that is "where the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess," *id.* at 140 (majority op.) (quoting *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977)). There is also at least one district court

civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Liappas v. Augoustis,* 47 So. 2d 582, 582 (Fla. 1950). For that reason, if a claim does not survive a motion to dismiss, it "cannot substantiate" a civil conspiracy claim. *See Alhassid*, 60 F. Supp. 3d at 1317; *Pro. Med.*, 13 So. 3d at 1096 ("Since the counts regarding the goals of the conspiracy — defamation and tortious interference — fail, so too the conspiracy count must fail."). But as long as one valid claim survives dismissal "and the named Defendants are alleged to have conspired with the primary tortfeasor, the civil conspiracy claim may proceed." *See Alhassid*, 60 F. Supp. 3d at 1317

### 6.   Federal Antitrust Act, 15 U.S.C. §§ 1–2 (Count VI)

The Sherman Act prohibits two categories of anticompetitive conduct. Section 1 prohibits every contract, combination, or conspiracy in restraint of trade or commerce among the several states. *See* 15 U.S.C. § 1. Section 2 prohibits monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce. *See* 15 U.S.C. § 2. The Sherman Act establishes the substantive prohibitions; it does not itself supply the private cause of action through which private parties enforce those prohibitions. *See Location 24, LLC v. Drs. Same Day Surgery Ctr., Inc.*, No. 22-CV-150-VMC-MRM, 2023 WL 2931458, at *4 (M.D. Fla. Jan. 18, 2023).

The Clayton Act, enacted in 1914 to extend and supplement the Sherman Act's reach, supplies the private remedy. The Clayton Act defines "antitrust laws" to expressly include the Sherman Act. *See* 15 U.S.C. § 12(a). Section 4 of the Clayton Act provides that "any person who

---

in this Circuit that "has held that a breach of contract claim can support a claim for civil conspiracy." *See Alhassid*, 60 F. Supp. 3d at 1317 (citing *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*, 679 F. Supp. 1564, 1579 (N.D. Ga. 1987)). But other "courts across the country interpreting civil conspiracy actions identical or nearly identical to those in Florida . . . have held that a breach of contract may not serve as a basis for a civil conspiracy claim." *Id.* at 1317–18. The latter conclusion better comports with fundamental contractual principles, which "delineate the general boundary between contract law and tort law" and "bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *See id.* at 1318 (quotation marks omitted).

shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" for treble damages, costs, and attorneys' fees. *See* 15 U.S.C. § 15. Section 16 of the Clayton Act, in turn, provides the corresponding private right to seek injunctive relief against threatened loss or damage by a violation of the antitrust laws. *See* 15 U.S.C. § 26. Because the Clayton Act's definition of "antitrust laws" expressly encompasses the Sherman Act, Sections 4 and 16 supply the private causes of action for Sherman Act violations as well as for Clayton Act violations. The Supreme Court has confirmed that when Congress enacted the Clayton Act, it "extended the remedy under section 7 of the Sherman Act to persons injured by virtue of any antitrust violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977). The Sherman Act and the Clayton Act thus operate as an integrated statutory scheme: the Sherman Act defines the prohibited conduct while the Clayton Act supplies the private remedy.

To recover under Section 4, a plaintiff must also demonstrate antitrust standing — an injury to business or property of the type the antitrust laws were designed to prevent, flowing from that which makes the defendant's conduct unlawful. *See Brunswick Corp.*, 429 U.S. at 489. The injury must reflect the anticompetitive effect of the violation or of anticompetitive acts made possible by the violation; injury that is merely a collateral byproduct of otherwise unlawful conduct is not sufficient. *Id.* To obtain injunctive relief under Section 16, a plaintiff must show threatened loss or damage proximately caused by a violation of the antitrust laws. *See* 15 U.S.C. § 26.

### 7. Breach of Contract (Count VII)

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *see also Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A.*, 676 F. Supp. 3d 1227, 1232 (S.D. Fla. 2023);

*Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008).  "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms."  *Vega*, 564 F.3d at 1272; *see also St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

## III.   DISCUSSION

The Court addresses Defendants' arguments in turn.  Defendants move to dismiss on four grounds: lack of subject-matter jurisdiction, lack of personal jurisdiction over Turiy, improper venue, and failure to state a claim on seven of the ten counts.  As to subject-matter jurisdiction, the Court finds that federal question jurisdiction is properly invoked under the Sherman and Clayton Acts and that Rudnitsky's allegation of $580,000 in damages satisfies diversity jurisdiction.  As to personal jurisdiction, Defendants do not contest personal jurisdiction over ICAONA, but they do as to Turiy.  Focusing on Turiy, the Court finds personal jurisdiction is not adequately pled on the face of the Complaint but recommends that Plaintiff be given leave to amend to properly plead personal jurisdiction over her.  As to venue, the Court finds that a substantial part of the events giving rise to the claims occurred in this District, making this an appropriate forum.  And as to the merits, the Court finds that Counts I, II, III, IV, V, and VI are adequately pled and survive the motion to dismiss whereas Count VII should be dismissed without prejudice and with leave to amend because Rudnitsky concedes that the bylaws do not constitute a classic contract and he has not pled an alternative legal theory sufficient to state a claim.  For the reasons explained below, I recommend that the Motion to Dismiss, **ECF No. [17]**, be **GRANTED IN PART AND DENIED IN PART**.

### A.    Subject-Matter Jurisdiction

### 1.  Federal Question Jurisdiction

Defendants argue that federal question jurisdiction is lacking because the Sherman Act does not provide a private right of action, and that the Court's TRO ruling finding that Rudnitsky lacked Sherman Act standing is dispositive. *See* ECF No. [17] at 3–4. Rudnitsky responds that the Sherman Act and Clayton Act operate together as an integrated enforcement scheme and that the TRO ruling was a preliminary, non-merits determination that does not control the Rule 12(b)(1) analysis. *See* ECF No. [23] at 3–4. The Court agrees with Rudnitsky on both points.

Defendants conflate two distinct questions: whether a valid private cause of action exists, and whether this Court has subject-matter jurisdiction to hear the claim at all. These are not the same inquiry. The absence of a valid claim for relief does not deprive a court of subject-matter jurisdiction — the former is a merits question. *See Steel*, 523 U.S. at 89; *Verizon*, 535 U.S. at 642–43. Federal question jurisdiction exists so long as the plaintiff's claim is not wholly insubstantial or frivolous. *See Verizon Md.*, 535 U.S. at 643. Rudnitsky's antitrust claim easily clears that bar.

In any event, Defendants' premise is incorrect as a matter of law. The Sherman Act establishes the substantive prohibitions; the Clayton Act supplies the private enforcement remedy. Section 4 of the Clayton Act authorizes any person injured by conduct forbidden by the antitrust laws to sue for treble damages. *See* 15 U.S.C. § 15. Section 16 authorizes injunctive relief against threatened loss from a violation of the antitrust laws. *See* 15 U.S.C. § 26. The term "antitrust laws" expressly includes the Sherman Act. *See* 15 U.S.C. § 12(a). When Congress enacted the Clayton Act in 1914, it "extended the remedy under section 7 of the Sherman Act to persons injured by virtue of any antitrust violation." *See Brunswick*, 429 U.S. at 485. The Clayton Act unambiguously supplies the private right of action for Sherman Act violations.

CASE NO. 25-CV-25063-BLOOM/Elfenbein

Defendants' reliance on the Order Denying the TRO is likewise unavailing. That Order rested solely on the correct proposition that the Sherman Act alone does not create a private right of action. *See* ECF No. [11] at 2–3. It did not, however, address the impact of the Clayton Act and its creation of a private right of action to enforce the provisions of the Sherman Act — arguments that Plaintiff raises in response to the Motion to Dismiss. Because Rudnitsky's antitrust claim presents a cognizable legal theory under the Sherman and Clayton Acts supported by specific factual allegations, it is neither wholly insubstantial nor frivolous, and federal question jurisdiction is properly invoked under 28 U.S.C. § 1331. Accordingly, I respectfully recommend Defendants' Motion to Dismiss for lack of federal question jurisdiction be **DENIED**.

### 2. Diversity Jurisdiction

Defendants argue that Rudnitsky's alleged damages are speculative, conclusory, and not legally recoverable, and therefore cannot satisfy the $75,000 amount-in-controversy requirement. *See* ECF No. [17] at 2–3. Rudnitsky responds that his alleged damages plausibly exceed $75,000 and that, where injunctive relief is sought, the amount in controversy is measured by the value of the right to be protected from his perspective. *See* ECF No. [23] at 3. The Court finds that Rudnitsky has adequately alleged the jurisdictional threshold.

A case filed in federal court under diversity jurisdiction will not be dismissed for failure to meet the amount-in-controversy requirement unless it appears to a legal certainty that the claim is actually for less than the jurisdictional amount. *See St. Paul*, 303 U.S. at 288–89. The sum claimed by the plaintiff controls so long as it is made in good faith. *Id.* at 288. Here, Rudnitsky alleges total damages of $580,000, itemized across four categories: $180,000 in lost labor and organizational investment based on 100 hours per month over eighteen months at $100 per hour; $200,000 in reputational damages; $100,000 in emotional distress damages including medical

expenses; and $100,000 in lost professional standing arising from his performance at the 2025 World Veterans Championship.  *See* ECF No. [1] at ¶¶ 64–71.  Defendants characterize these damages as speculative and legally unrecoverable, but that argument goes to the merits of each claim, not to the amount in controversy.  At this stage, the Court is not called upon to determine whether Rudnitsky will ultimately prevail on his damages theories, only whether his claim for relief exceeds $75,000 as a matter of good-faith pleading.  It plainly does.

Moreover, where a plaintiff seeks injunctive and declaratory relief — as Rudnitsky does here — the amount in controversy is measured by the monetary value of the object of the litigation from the plaintiff's perspective.  *See Cohen*, 204 F.3d at 1077.  Rudnitsky seeks, among other things, restoration of his eligibility to participate in the U.S Open and FMJD-sanctioned international competitions.  *See* ECF No. [1] at p. ¶ 2.  The value of those competitive opportunities to a five-time U.S. National Champion and two-time World Veterans Champion who alleges sixty-five years of professional investment in the sport is not, as a matter of legal certainty, less than $75,000.  It is not legally impossible that the object of this litigation, measured from Rudnitsky's perspective, exceeds the jurisdictional threshold.  Accordingly, I respectfully recommend Defendants' Motion to Dismiss for failure to satisfy the amount-in-controversy requirement be **DENIED**.

### B.    Personal Jurisdiction

Defendants move to dismiss for lack of personal jurisdiction over Turiy only.  *See* ECF No. [17] at 4–5.  Defendants do not challenge personal jurisdiction over ICAONA, which organized and hosted the U.S. Open 2025 in Miami Beach, Florida.  Accordingly, the Court need only address personal jurisdiction as to Turiy.

Defendants argue that the Complaint alleges no conduct by Turiy occurring in Florida, no tortious conduct committed in Florida, and no purposeful availment of the Florida forum, and that conclusory allegations of harm felt in Florida are insufficient. *See* ECF No. [17] at 5. In challenging personal jurisdiction as to Turiy, Defendants do not submit any affidavits to factually attack the allegations within the Complaint. Instead, Defendants limit their challenge to the sufficiency of the allegations of personal jurisdiction as pled. Rudnitsky responds that Turiy personally authored false accusations directed at Florida-based events and organizations, was physically present in Miami Beach on November 21, 2025, and personally enforced Rudnitsky's exclusion from the U.S. Open 2025 venue. *See* ECF No. [23] at 4–6. The Court finds that the Complaint's allegations *as pled* are insufficient to establish personal jurisdiction over Turiy, but this does not mean that the facts Plaintiff proffers could not ultimately support it.

The Complaint's jurisdictional allegations as to Turiy are largely conclusory. Paragraph 8 alleges that Turiy is "the driving force of the tortious decisions made against Rudnitsky, including banning him from participating in the Championship in Miami Beach, Florida, which subjects Turiy to the long-arm jurisdiction of the State of Florida." *See* ECF No. [1] at ¶ 8. This is a legal conclusion, not a factual allegation. The substantive count-specific allegations add more detail — the November 13, 2024 letter to FMJD, the January 2025 chat communications, and the Zelle memo — but these communications were transmitted from New York and directed at an international governing body located abroad. While they caused harm that was felt in Florida, the *Calder* effects test's express aiming prong requires more than harm being suffered in the forum — the defendant must have expressly aimed her conduct at the forum state itself. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[T]he plaintiff cannot be the only link between the defendant and the forum.").

31

The factual predicate that would most clearly support personal jurisdiction over Turiy — her alleged physical presence in Miami Beach on November 21, 2025, personally enforcing Rudnitsky's exclusion from the venue — does not appear in the body of the Complaint. It appears only in Plaintiff's Response. *See* ECF No. [23] at 5. Similarly, Turiy's alleged role as Chief Arbiter of the U.S. Open 2025 — which would place her physically in this District in the exercise of direct control over the tournament — is not alleged in the Complaint either. These are precisely the kinds of facts that may satisfy the *Calder* effects test and are likely to establish specific jurisdiction under Florida's long-arm statute. Given that Defendants did not present any affidavits to challenge the allegations of personal jurisdiction and instead challenged it solely based on the face of the Complaint, the Court is limited at this stage to the four corners of the Complaint. *See* ECF No. [27] at 1–2.

Because the factual predicate for personal jurisdiction over Turiy may exist — it has simply not been pled — dismissal without prejudice and with leave to amend is the appropriate remedy. The Court, therefore, recommends that Rudnitsky be given leave to file an Amended Complaint that incorporates the specific factual allegations necessary to establish personal jurisdiction over Turiy, including her physical presence and role in this District in connection with the events at issue. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss for lack of personal jurisdiction as to Turiy be **GRANTED** and that Plaintiff's claims against her be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**.

C.    **Venue**

Defendants argue that venue is improper in the Southern District of Florida because both Defendants reside in New York, ICAONA is headquartered in New York, and all decisions, communications, and actions giving rise to the claims occurred in New York rather than Florida.

32

*See* ECF No. [17] at 5–6. Rudnitsky responds that the core tortious act — his physical exclusion from the U.S. Open 2025 — occurred in Miami Beach, Florida on November 21, 2025, and that even conduct formally taken outside Florida was expressly directed at Florida-based events and relationships. *See* ECF No. [23] at 8–9. The Court finds that venue is proper in this District.

Venue is proper where a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Only the events that directly give rise to a claim are relevant to this inquiry, and of those events, only those locations hosting a substantial part of them are to be considered. *See Jenkins*, 321 F.3d at 1371. The inquiry does not require that the Southern District of Florida be the only district where venue is proper, or even the best district — only that a substantial part of the relevant events occurred here. *Id.*

The Complaint's allegations satisfy that standard. The central event underlying every count in this action is Rudnitsky's exclusion from the U.S. Open 2025, which occurred in Miami Beach, Florida on November 21, 2025. *See* ECF No. [1] at ¶¶6, 7, 40. ICAONA organized, hosted, and administered the tournament in Miami Beach, which is within the Southern District of Florida. *See* ECF No. [1] at ¶7. The harm Rudnitsky alleges — loss of access to the sole qualifying event for international competition, reputational injury, and economic damage — was suffered in Florida, where he resides and where the tournament took place. *See* ECF No. [1] at ¶¶3, 40, 63–71. That the decisions and communications underlying the exclusion may have originated in New York does not defeat venue here. Under *Jenkins*, what matters is whether a substantial part of the events giving rise to the claims occurred in this District — not whether all of them did. *Jenkins*, 321 F.3d at 1371. The actual enforcement of Rudnitsky's exclusion at the Miami Beach venue is precisely the type of event that directly gives rise to his claims. *See* ECF No. [1] at ¶¶72–175.

Defendants' argument that all relevant conduct occurred in New York is not persuasive on the face of the Complaint.  ICAONA conducted the U.S. Open 2025 in Miami Beach.  *See* ECF No. [1] at ¶7.  ICAONA's president, Azimullah, resides in Tampa, Florida, and conducted ICAONA business from within the state.  *See* ECF No. [1] at ¶4.  The bylaw amendments that formed the mechanism for Rudnitsky's exclusion were enforced at a Florida tournament.  *See* ECF No. [1] at ¶¶23–26, 40.  The allegedly coercive ultimatum letters conditioning Rudnitsky's access to competition on withdrawal of this lawsuit were directed at a Florida resident in anticipation of a Florida event.  *See* ECF No. [1] at ¶¶8, 40.  These are not merely the felt effects of out-of-state conduct — they are events that directly gave rise to the claims and that occurred or were directed at this District.  Accordingly, I respectfully recommend that Defendants' Motion to Dismiss for improper venue be **DENIED**.

### D.     Defamation (Count I)

Next, Defendants argue that Rudnitsky fails to identify any defamatory statement with the specificity required under Florida law and that the alleged communications fall within a qualified privilege.  *See* ECF No. [17] at 6–7.  The Court disagrees.

The Complaint identifies at least four discrete defamatory acts with the specificity Florida law requires — speaker, recipient, content, date, falsity, and resulting harm.  First, on November 13, 2024, Turiy allegedly transmitted a letter to FMJD Tournament Director Siep Buurke accusing Rudnitsky and NDF of "forgery of signatures," "fraud," and "falsification and deception" in connection with Miami Open 2025, which directly caused FMJD to remove Miami Open 2025 from its official tournament calendar and disrupted signed hotel contracts, advertising agreements, player invitations, and an established prize fund.  *See* ECF No. [1] at ¶¶74–79.  Second, on January 17, 2025, Turiy allegedly accused Rudnitsky and others of "corruption" in chat communications

transmitted to third parties, proposing his disqualification to prevent his participation in the World Championship Final and describing Miami Open 2025 as "illegitimate" to players and federations worldwide. *See id*. at ¶¶80–82. Third, the Complaint alleges that, on September 5, 2025, ICAONA published a Zelle payment memo falsely asserting that NDF was the subject of active investigation and litigation. *See id*. at ¶¶29-30, 83–85. Fourth, ICAONA labeled NDF in written communications a "shadow self-proclaimed organization," falsely portraying a lawfully incorporated Florida nonprofit as illegitimate and unlawful. *See id*. at ¶¶85–87.

Each of these statements is a verifiable assertion of fact — not opinion — that is alleged to be false. *See Turner*, 879 F.3d at 1262. Accusations of forgery, fraud, and criminal conduct are defamatory *per se* under Florida law, for which damages are presumed. *See Jews for Jesus, Inc.*, 997 So. 2d 1098. The remaining statements — accusing Rudnitsky of corruption and falsely characterizing NDF as illegitimate and under investigation — tend to injure Rudnitsky in his profession and deter third parties from associating or dealing with him, satisfying the defamatory character element. *See Johnston*, 36 F.4th at 1275.

As to qualified privilege, Defendants offer no facts establishing a good-faith basis for the statements, and the Complaint plausibly alleges actual malice that defeats any privilege — Turiy's own communications explicitly identified Rudnitsky's disqualification as a means to suppress NDF's development and bar him from the World Championship Final, demonstrating that the primary motive was to injure rather than to advance any legitimate organizational interest. *See* ECF No. [1] at ¶¶80, 90. Count I, therefore, states a claim for defamation under Florida law. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Count I be **DENIED**.

###### E.      Tortious Interference (Count II)

Defendants argue that the tortious interference claim fails because Rudnitsky identifies only vague groups of alleged third-party relationships — "sponsors," "players," and "coaches" — without naming a single individual, contract, or specific third-party commitment, and that the Complaint's own paragraphs contradict one another as to the nature and existence of the alleged business interference. *See* ECF No. [17] at 7–9. Rudnitsky responds that he has identified concrete business relationships with FMJD regarding the sanctioning of Miami Open 2025, negotiations with donors and sponsors, a Miami-Dade County hotel contract, vendor arrangements, and relationships with international players and federations, and that Florida law requires no formal contract to sustain the claim. *See* ECF No. [23] at 11–12. The Court finds that the Complaint adequately states a tortious interference claim.

To satisfy the first element, a plaintiff need not allege an enforceable contract — the claim requires only "an actual and identifiable understanding or agreement which in all probability would have been completed" but for the defendant's interference, affording the plaintiff existing or prospective legal rights with present or prospective customers. *See Ethan Allen*, 647 So. 2d at 814–15. The Complaint identifies several such relationships with the specificity this standard requires. Rudnitsky alleges that NDF, through his personal negotiation and investment, had secured a contract with a Miami-Dade County hotel for venue and accommodations for Miami Open 2025, with significant deposits already paid. *See* ECF No. [1] at ¶78. He further alleges advertising agreements with a local magazine, vendor arrangements for catering and event services, a secured $9,000 prize fund, and confirmed commitments from international players and national federations who had accepted invitations and received visa support letters. *See id*. at ¶¶78–79. He further alleges that FMJD had formally recognized Miami Open 2025 by placing it

on its official international tournament calendar at the recommendation of the FMJD President, and had issued multiple letters of support confirming that NDF operated within the FMJD framework, establishing an existing relationship with the international governing body that Defendants' conduct directly disrupted. *See* ECF No. [1] at ¶¶18, 38, 98. These are not vague references to the community at large — they are identified, existing business relationships with specific counterparties that were in progress and would in all probability have been completed but for Defendants' conduct.

To satisfy the second element, knowledge of the business relationship, it need not be pled with specificity, as a tortious interference claim is not subject to a heightened pleading standard and Rule 9 permits knowledge to be alleged generally. *See Sun Life*, 904 F.3d at 1215; Fed. R. Civ. P. 9(b). The Complaint more than satisfies this relaxed standard. Turiy's November 13, 2024 letter to FMJD expressly targeted Miami Open 2025 by demanding its removal from the FMJD calendar — a tournament whose hotel contract, venue arrangements, player invitations, and prize fund had been established months earlier. *See* ECF No. [1] at ¶¶74–79. The January 2025 chat communications further demonstrate that Turiy explicitly discussed Rudnitsky's disqualification as a means to halt NDF's development and prevent the tournament's success. *See id.* at ¶80. Thus, ICAONA's knowledge of Rudnitsky's business relationships is amply alleged.

For the third element of intentional and unjustified interference, the Complaint plausibly alleges that Defendants interfered through improper means — specifically, by transmitting knowingly false accusations of forgery, fraud, and falsification to FMJD, which directly caused Miami Open 2025 to be removed from the official calendar and disrupted every dependent business relationship. *See* ECF No. [1] at ¶¶74–75, 79, 94-96. The use of false statements as the mechanism of interference is itself evidence of a lack of justification. Whether Defendants can

ultimately establish a privilege to interfere is an affirmative defense that does not clearly appear on the face of the Complaint, and its resolution would be premature at this stage. *See Peacock*, 432 So. 2d at 144–45. The factual question of whether ICAONA's conduct was justified — given that the Complaint alleges the stated grounds for the interference were knowingly false and pretextual — is not one appropriately resolved on a motion to dismiss.

Finally, as a direct result of the interference, Rudnitsky alleges that Miami Open 2025 was temporarily removed from the FMJD calendar, contracts with hotels and advertising partners were disrupted, player participation declined, donors and sponsors were deterred, and eighteen months of organizational investment totaling approximately $180,000 in labor value was rendered worthless. *See* ECF No. [1] at ¶¶64–65, 78–79. These allegations are sufficient at the pleading stage, where a plaintiff need not quantify damages with precision but must only allege actual harm resulting from the interference. Thus, Plaintiff's allegations in Count II of the Complaint are sufficient to state a claim for tortious interference with business relationships. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Count II be **DENIED**.

### F.      Breach of Fiduciary Duty (Count III)

Defendants' argument on breach of fiduciary duty is limited to a single sentence: "The count has an array of conclusory allegations, but all fail to state a cause of action as outlined above." *See* ECF No. [17] at 9. That is the entirety of Defendants' argument on this count. Defendants offer no analysis as to how the Complaint's specific allegations fail to satisfy any of the three elements, identify no controlling authority establishing that the relationship alleged cannot give rise to a fiduciary duty as a matter of law, and make no effort to explain why the conduct alleged does not constitute a breach or why the damages alleged are not proximately caused. The Eleventh Circuit has long held that a party abandons a claim when it either makes

only passing references to it or raises it in a perfunctory manner without supporting arguments and authority. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Defendants' single conclusory sentence asserting insufficiency, unaccompanied by any developed argument, authority, or engagement with the Complaint's specific allegations, does not give the Court a legal argument to evaluate. The Court declines to construct that argument on Defendants' behalf. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Count III be **DENIED**.

### G. FDUTPA (Count IV)

Defendants argue that FDUTPA does not apply because the allegations concern a nonprofit's internal membership eligibility and disciplinary decisions, which do not constitute "trade or commerce" under the statute. *See* ECF No. [17] at 9–10. Rudnitsky responds that ICAONA operated in the market for sports services — organizing tournaments, controlling athlete admission, managing qualification pathways, collecting membership and participation fees, and contracting with Florida hotels and venues — all of which fall within FDUTPA's broad definition of "trade or commerce." *See* ECF No. [23] at 13–15. As explained below, Defendants' argument fails under the text of the statute.

Defendants' singular argument regarding FDUTPA — that a nonprofit's internal governance decisions fall outside FDUTPA's scope — is directly foreclosed by the statute. Florida Statute § 501.203(8) defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated," and expressly provides that "[t]rade or commerce shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or

39

activity." Fla. Stat. § 501.203(8).  The statute could not be clearer: a nonprofit organization's activities are expressly within FDUTPA's reach.  Defendants' contention that ICAONA's nonprofit status shields its conduct from FDUTPA scrutiny is contrary to the plain text of the statute and is rejected.

Nor is the conduct alleged limited to internal governance.  The Complaint alleges that ICAONA organized and administered the U.S. Open 2025 as a paid competitive event in Florida, collected membership and participation fees from athletes, contracted with Florida hotels and venues, solicited participants and sponsors, controlled access to FMJD international qualification pathways, and promoted its tournaments as FMJD-sanctioned and open to international participation.  *See* ECF No. [1] at ¶¶26, 141, 145, 148.  These are commercial activities — soliciting, offering, and providing competitive sports services — that fall squarely within the statutory definition of "trade or commerce" regardless of ICAONA's nonprofit status.  As Count IV states a claim for relief under FDUTPA, I respectfully recommend that Defendants' Motion to Dismiss Count IV be **DENIED**.

## H.      Civil Conspiracy (Count V)

As to civil conspiracy, Defendants only argue that the civil conspiracy count fails because Rudnitsky has failed to state a claim for relief on any of the underlying torts.  *See* ECF No. [17] at 10.  Defendants' argument fails for the straightforward reason that its premise is incorrect.  As set forth above, the Court has determined that Rudnitsky has adequately stated claims for defamation (Count I), tortious interference with business relationships (Count II), breach of fiduciary duty (Count III), and violation of FDUTPA (Count IV).  Each of those claims survives Defendants' Motion to Dismiss and supplies an actionable underlying tort sufficient to sustain the civil conspiracy count.  Because at least one — and in fact all four — of the predicate tort claims survive,

Defendants' derivative challenge to Count V, which is based solely on the rejected argument that Counts I through IV fail to state a claim, necessarily fails.  Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Count V be **DENIED**.

## I.        Federal Antitrust Act, 15 U.S.C. §§ 1–2 (Count VI)

Next, Defendants argue that the Sherman Act does not provide a private right of action; therefore, Count VI must be dismissed for lack of a cognizable claim for relief.  *See* ECF No. [17] at 11–12.  Defendants cite to the Order Denying the TRO, which found that Rudnitsky lacked standing to bring a Sherman Act claim because "[t]he Sherman Act does not alone create a private right of action."  *See id*. at 4 (quoting ECF No. [11] at 3).  In his Response, Rudnitsky argues that the Sherman Act provides the prohibited conduct while the Clayton Act working hand-in-hand with the Sherman Act supplies the private remedy, and that the Complaint's allegations plausibly state claims under both Sherman Act Sections 1 and 2.  *See* ECF No. [23] at 16–18.  The Court agrees with Rudnitsky.

As set forth in the Legal Standard above, the Sherman Act establishes the substantive prohibitions against anticompetitive conduct; it does not itself supply a private cause of action. *See Location 24*, 2023 WL 2931458 at *4.  It is the Clayton Act that supplies the private remedy as it expressly defines "antitrust laws" to include the Sherman Act, 15 U.S.C. § 12(a), and authorizes any person injured in his business or property by conduct forbidden by the antitrust laws to sue for treble damages, 15 U.S.C. § 15, and injunctive relief, 15 U.S.C. § 26.  When Congress enacted the Clayton Act in 1914, it "extended the remedy under section 7 of the Sherman Act to persons injured by virtue of any antitrust violation."  *See Brunswick*, 429 U.S. at 485.  The Sherman Act and the Clayton Act operate as an integrated statutory scheme.

41

CASE NO. 25-CV-25063-BLOOM/Elfenbein

The Court's Order Denying the TRO correctly stated that the Sherman Act alone does not provide a private right of action. *See* ECF No. [11] at 2–3. At that stage, however, neither party briefed the Clayton Act's role as the remedial vehicle for private Sherman Act enforcement. *See* ECF No. [6]. Accordingly, the Court neither considered nor addressed the relationship between the Clayton Act and the Sherman Act. Having had the benefit of full briefing on the Motion to Dismiss, the Clayton Act supplies the requisite private right of action for Rudnitsky's Sherman Act claims, regardless of whether the Complaint expressly cited the Clayton Act.[7] *See Twombly*, 550 U.S. at 556. A complaint that plausibly alleges conduct forbidden by the Sherman Act invokes the Clayton Act's private remedy as a matter of law. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Count VI be **DENIED**.

### J.      Breach of Contract (Count VII)

Finally, Defendants argue that the breach of contract claim fails because Rudnitsky does not identify any specific contract, its essential terms, or how Defendants allegedly breached it, and that organizational bylaws do not automatically constitute enforceable contracts between a nonprofit and its members. *See* ECF No. [17] at 11. In his Response, Rudnitsky expressly concedes that ICAONA's bylaws "do not necessarily constitute a classic contract under Florida contract law." *See* ECF No. [23] at 18–19. Having made that concession, Rudnitsky pivots to argue that the bylaws are instead subject to federal regulatory and antitrust scrutiny as instruments of market regulation, relying on *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), for the

---

[7] Although the Complaint did not expressly cite to the provisions of the Clayton Act, it can be inferred as Count VI alleges that "[t]he Sherman Act permits a private right of action, allowing private parties to sue for damages or seek injunctive relief when antitrust violations harm them. Successful plaintiffs can recover 'treble damages' (three times the amount of actual damages), attorney's fees, and costs of suit." *See* ECF No. [1] at ¶175.

proposition that private association rules used to regulate access to a market are subject to judicial review regardless of their contractual character. *See* ECF No. [23] at 19.

That argument may well have merit, but it is not a breach of contract claim. Rudnitsky's own concession that the bylaws do not constitute a classic contract forecloses Count VII as pled. To state a breach of contract claim under Florida law, a plaintiff must allege the existence of a valid contract, a material breach, and resulting damages. Rudnitsky has acknowledged he cannot satisfy the first element. His pivot to a regulatory or antitrust theory does not cure that deficiency — it describes an entirely different claim for relief that is not currently before the Court. The Court cannot and will not deny a motion to dismiss a claim for breach of contract on the basis of a completely different unpled theory of liability.

To the extent Rudnitsky seeks to pursue a claim grounded in the theory that ICAONA weaponized its bylaws as a regulatory instrument to exclude him from the market in violation of federal law, he may move for leave to amend under Federal Rule of Civil Procedure 15(a) to add that claim with the appropriate legal theory and factual support. The Court expresses no view on the viability of such a claim at this time. Accordingly, Defendants' Motion to Dismiss Count VII for breach of contract should be **GRANTED**.

## IV.    CONCLUSION

For the reasons explained above, I respectfully **RECOMMEND** that the Motion to Dismiss, **ECF No. [17]**, be **GRANTED in part and DENIED in part**. Specifically, I recommend that (1) the Motion to Dismiss be **GRANTED** as to personal jurisdiction over Turiy and as to Count VII (Breach of Contract/Member Rights) and that the Complaint be dismissed without prejudice and with leave to amend to add additional allegations of personal jurisdiction as to Turiy and (2) that the Motion to Dismiss be **DENIED** in all other respects.

CASE NO. 25-CV-25063-BLOOM/Elfenbein

The Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to timely file objections shall bar the Parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on April 22, 2026.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record

44