**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**No. 25-cv-25063-BLOOM/Elfenbein**

ALEXANDER RUDNITSKY,

Plaintiff,

v.

INTERNATIONAL CHECKERS ASSOCIATION OF NORTH AMERICA INC., and LYUBLYANA K. TURIY, aka LYUBYANA TURIY, aka LUBA K. TURIY, aka L.K. TURIY

Defendants.
______________________________________/

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Plaintiff Alexander Rudnitsky's ("Rudnitsky") Motion for Summary Judgment ("Motion"), ECF No. [43]. Defendant International Checkers Association of North America ("ICAONA") filed a Response in Opposition ("Response"), ECF No. [53], to which Rudnitsky filed a Reply, ECF No. [57]. The Court has reviewed the Motion, the supporting and opposing submissions, the record, and is otherwise fully advised. For the reasons that follow, the Motion is granted in part and denied in part.

## I. BACKGROUND

In 2002, ICAONA was established as a nonprofit corporation. ECF No. [43-2] ¶ 1. Between 2002 and 2024, Rudnitsky became United States National Champion five times and World Veterans Champion twice in the game of checkers. *Id.* ¶ 197. During that time, Rudnitsky was one of the most active members of ICAONA. *Id.* ¶ 196. Indeed, between 2022 and 2025, Rudnitsky served as Vice President of ICAONA. *Id.* ¶ 193. Between 2002 and 2024, ICAONA functioned *de facto* as the sole organization of its type in the United States. ECF No. [24] ¶ 7.

In 2005, ICAONA became a member of the World Draughts Federation ("FMJD") and obtained the right to conduct U.S. qualifying championships for FMJD international tournaments. *Id*. As a result, all players from the United States had to go through ICAONA to access FMJD national and international competitions. *Id.* ¶¶ 7, 8. That also meant that ICAONA established conditions for admission to competitions and rules governing participant conduct, including mandatory membership and financial contribution requirements. *Id.* ¶ 11. One such rule prohibited any mention or promotion of alternative organizations during tournaments. *Id.* ¶ 12.

In 2024, Rudnitsky and his colleagues created an alternative nonprofit organization—the National Draughts Federation of the USA ("NDF"). *Id.* ¶ 14. The primary goal of NDF was to develop international draughts in Florida and the United States through (1) creating and developing an annual international tournament, the MIAMI OPEN, (2) the creation of new social projects in draughts, (3) the development of youth and junior programs, and (4) the popularization of the game at the local community level in Florida. *Id.* ¶ 17. After its creation, NDF announced and began preparing for the 2025 MIAMI OPEN, which was to be held in Florida. *Id.* ¶ 18. The tournament was included in the FMJD calendar. *Id.* ¶ 19.

On November 13, 2024, Lyublyana Turiy ("Turiy"), ICAONA's Executive Director, sent a letter to FMJD demanding that the MIAMI OPEN be removed from the FMJD 2025 calendar. ECF Nos. [43-2] ¶¶ 138, 140 and[24-14]. In that letter—which was public—Turiy stated the that the signature of ICAONA President R. Azimullah was "likely forged," the event was falsified, and they likely lied about player accommodation and the availability of prize funds. ECF No. [24-14] ¶ 139. The 2025 MIAMI OPEN was thereafter excluded from the FMJD calendar for over a month. ECF No. [43-2] ¶ 141. ICAONA understood that by addressing the highest level of the FMJD with

the public letter, it was causing serious damage to the reputations of NDF and Rudnitsky. *Id.* ¶ 143.

In January 2025, the 2025 MIAMI OPEN was re-included in the FMJD 2025 calendar. *Id.* ¶ 144. Also in January 2025, Rudnitsky became aware of communications between Turiy and other individuals, in which the possibility of his disqualification was directly discussed—the goal was to prevent his participation in the 2025 World Championship, stop the development of the "illegitimate" NDF, and organize individuals to disseminate information discrediting NDF. ECF Nos. [43-2] ¶¶ 155–58; [24-15]. The communications referred to Rudnitsky as corrupt. ECF No. [43-2] ¶ 155. Around that time, ICAONA discussed possible measures of influence and sanctions against players and ICAONA members for recognizing, supporting, or participating in NDF tournaments. *Id.* ¶ 149. Turiy and others contacted players from the United States and other countries, proposing that they not attend the 2025 MIAMI OPEN tournament and that they continue supporting ICAONA against NDF. *Id.* ¶¶ 150–54.

At ICAONA's initiative, the issue concerning NDF was included in the agenda for the FMJD Executive Committee meeting on March 3, 2025. *Id.* ¶ 145; [24-9]. At the Executive Committee meeting, ICAONA again raised the issue of removing the 2025 MIAMI OPEN tournament from the FMJD 2025 calendar. ECF No. [43-2] ¶ 146. FMJD informed ICAONA that it recognized NDF's right to organize the MIAMI OPEN. *Id.* ¶ 165.

Between 2002 and spring 2025, the ICAONA Charter was in force without amendments. *Id.* ¶ 167; [24-3]. The only rules defining violations for which an athlete could be suspended from membership were alcohol consumption, drug use, or non-payment of membership fees. ECF No. [43-2] ¶ 168. During that same period, the ICAONA Charter provided for only two competitions: the New York Championship and the ICAONA Championship. *Id.* ¶ 169. It did not provide for a

U.S. National Championship. *Id.* ¶ 170. The Charter only allowed ICAONA to suspend a competitor from its own competitions provided in the Charter, not from international FMJD tournaments. *Id.* ¶ 171–72.

In April 2025, amendments to the ICAONA Charter were introduced, and Rudnitsky was disqualified based on the new additions and amendments, being designated an "inactive member." *Id.* ¶¶ 173, 175, 180; [24-5]. Indeed, Rudnitsky was the only person against whom sanctions were applied under the updated Charter, even though the Charter does not contain a definition of or criteria for status as an "inactive member." ECF No. [43-2] ¶¶ 176, 181. ICAONA did not inform Rudnitsky that it intended to designate him an "inactive member," nor did it follow its own procedures, as it did not notify Rudnitsky of or invite him to the meeting during which the issue of his "inactive member" status was discussed and did not provide him with the opportunity to defend himself or appear with his attorney. *Id.* ¶¶ 191, 192.

As a result of his disqualification, ICAONA refused to nominate Rudnitsky for the 2025 World Veterans Championship. *Id.* ¶ 178. Further, ICAONA repeatedly contacted FMJD demanding that Rudnitsky be barred from the 2025 World Veterans Championship. *Id.* ¶ 179.

On June 15, 2025, ICAONA received a letter from FMJD's Secretary General confirming Rudnitsky's right to participate in all competitions until the FMJD Ethics Committee issued a decision. *Id.* ¶ 199; [24-17]. In July 2025, ICAONA received a letter from the FMJD confirming that every player registered in the FMJD database must have the opportunity to participate in the U.S. National Championship. ECF Nos. [43-2] ¶ 206; [24-18]. The letter stated that restricting player participation in the U.S. National Championship based on non-membership in ICAONA was discriminatory and prohibited by the FMJD Statutes. ECF No. [43-2] ¶ 208. The letter also stated that refusal to allow NDF to organize the MIAMI OPEN 2026 as a World Cup stage and the

requirement that a player become a member of ICAONA to permit transfer to the United States tend to constitute abuses of the powers granted by FMJD membership. *Id.* ¶ 209. ICAONA was given until July 28, 2025 to comply and eliminate discriminatory practices and abuses of authority. *Id.* ¶¶ 210, 111. ICANOA did not comply by July 28, 2025. *Id.* ¶ 212.

Instead, in the Regulations for the 2025 US OPEN, ICAONA described "USA SPECIFIC QUALIFICATIONS" that contradict the FMJD statutes and general principles of sport by effectively forcing U.S. players to join ICAONA in order to participate in the U.S. National Championship and obtain international qualification. *Id.* ¶¶ 217, 218; [24-10]. The Regulations for the 2025 US OPEN, mandatory for all participants in and spectators of the tournament, prohibited promoting, representing, or advertising any other competing draughts organizations in the United States. ECF No. [43-2] ¶¶ 221–28. A violation would result in a player's immediate exclusion from the tournament or a ban on a spectator's further attendance. *Id.* ¶¶ 229, 230.

Ultimately, FMJD admitted Rudnitsky to the World Veterans Championship in September 2025. *Id.* ¶ 182. ICAONA and Turiy demanded that FMJD prohibit Rudnitsky from using the U.S. flag or the "USA" country designation during games. *Id.* ¶ 183. During the first two days, Rudnitsky participated without the U.S. flag and without the "USA" country designation, causing serious harm to Rudnitsky and affecting his sporting career. *Id.* ¶¶ 187, 188.

In October 2025, the FMJD Ethics Committee issued its decision, finding all accusations made by ICAONA against Rudnitsky unfounded. *Id.* ¶ 248; [24-19]. His disqualification was declared invalid, and all his rights as an FMJD player were restored. ECF No. [43-2] ¶¶ 249, 250. That decision applied to participation in U.S. national championships that are FMJD qualifying tournaments. *Id.* ¶ 251. Furthermore, the creation and activities of NDF were found to not violate

the FMJD Statutes, and ICAONA was found to have violated the principles of fairness and non-discrimination and abused its status. *Id.* ¶¶ 257, 259, 260.

The same day that the FMJD Ethics Committee issued its decision, Rudnitsky sent a letter to ICAONA formally requesting confirmation of his participation in the 2025 U.S. Championship. *Id.* ¶ 270. On October 5, 2025, ICAONA sent a letter to FMJD disputing the FMJD Ethics Committee's decision. *Id.* ¶ 284. The letter stated the ICAONA did not recognize the binding nature of the FMJD Ethics Committee Decision. *Id.* ¶ 289. On October 13, 2025, the FMJD Executive Committee held an official meeting at which ICAONA appealed the FMJD Ethics Committee Decision. *Id.* ¶¶ 307, 308. The FMJD Executive Committee confirmed that it has no authority to annul decisions of the FMJD Ethics Committee. *Id.* ¶ 312.

ICAONA then submitted a protest to the FMJD General Assembly. *Id.* ¶ 323. The General Assembly approved all Executive Committee Decisions for the reporting period of May 2023 to October 2025, which included the Executive Committees Decisions of June and July 2025 affirming Rudnitsky's right to play in all competitions and identifying ICAONA's discriminatory practices that were required to be immediately discontinued. *Id.* ¶ 365. The General Assembly did not annul or suspend the FMJD Ethics Committee Decision. *Id.* ¶ 368.

On October 27, 2025, ICAONA received a letter from Rudnitsky demanding confirmation of his participation in the 2025 U.S. Championship based on the FMJD Ethics Committee's Decision. *Id.* ¶ 370. A response sent the same day from Turiy asserted that Rudnitsky was "grossly misinformed" regarding the events at the FMJD General Assembly. *Id.* ¶ 375. The letter did not confirm Rudnitsky's participation in the 2025 U.S. Championship. *Id.* ¶ 379. Instead, ICAONA conditioned Rudnitsky's participation in the 2025 U.S. National Championship on his rejoining ICAONA. *Id.* ¶ 380.

On November 11, 2025, ICAONA sent Rudnitsky a memorandum conditioning Rudnitsky's right to participate on him accepting all conditions set by ICAONA. *Id.* ¶¶ 385–388; [12-2]. This included requiring Rudnitsky to withdraw his federal lawsuit and to stop initiating or supporting any future complaints, protests, or legal actions related to events occurring before November 11, 2025. ECF No. [43-2] ¶¶ 391, 392. It also included the requirement that Rudnitsky withdraw all of his submissions to the FMJD Executive Committee and the FMJD Ethics Committee and stop mentioning or promoting NDF. *Id.* ¶¶ 393, 398. Rudnitsky refused to accept the conditions of the letter and was excluded from the 2025 U.S. Championship and, by extension, the FMJD international qualification. *Id.* ¶¶ 404, 405. The demand that Rudnitsky withdraw his federal complaint was renewed in a November 14, 2025 personal letter from Turiy to the FMJD President. *Id.* ¶ 416; [12-3]. At the time the letter was sent, Turiy was aware that the threatened loss of opportunity to compete for two to three years would be substantial and irreparable for a professional athlete. ECF No. [43-2] ¶¶ 418, 419. Indeed, exclusion from the 2025 U.S. Championship would mean the end of Rudnitsky's sporting career. *Id.* ¶ 427. At that point, one week remained before the start of the 2025 U.S. Championship. *Id.* ¶ 423.

On November 20, 2025, Turiy sent a letter that she did not intend to participate in any further discussion of the issue of Rudnitsky's admission and stated that discussions would be possible only after the conclusion of the 2025 U.S. Championship. *Id.* ¶¶ 454, 456; [24-24]. Turiy reiterated that Rudnitsky must comply with ICAONA's conditions to be admitted to participate in the 2025 U.S. Championship. ECF No. [43-2] ¶ 457.

On November 21, 2025, Rudnitsky arrived with his attorney, George Lambert, at the Miami Beach venue of the 2025 U.S. Championship to deliver to the tournament's Chief Arbiter an official written demand for admission to participate. *Id.* ¶¶ 473, 474. Turiy served as the Chief

Arbiter and was obliged to accept and register official written submissions from participants or their representatives. *Id.* ¶¶ 475, 480. On the day the 2025 U.S. Championship commenced, Turiy refused to physically accept or register the letter. *Id.* ¶¶ 481–83. This represented the final exclusion of Rudnitsky from the competition. *Id.* ¶ 487.

On December 3, 2025, ICAONA sent a letter to the FMJD Executive Committee, asserting that Rudnitsky's disqualification remained fully in force and that only by signing ICAONA's memorandum could Rudnitsky's status be restored. *Id.* ¶¶ 494, 497.

On November 2, 2025, Rudnitsky filed his Complaint against ICAONA, asserting the following Counts: Defamation (Count I), Tortious Interference with Business or Advantageous Relations (Count II), Breach of Fiduciary Duties (Count III), Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count IV), Civil Conspiracy (Count V), Federal Antitrust Sherman Act (Count VI), Breach of Contract; Violation of Member's Rights (Count VII)[1], Declaratory Relief (Count VIII), Injunctive Relief (Count IX), Severe Emotional Distress (Count X). *See generally* ECF No. [1].

Rudnitsky now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 because ICAONA failed to respond to Requests for Admissions served by Rudnitsky on February 16, 2026. ECF No. [43] at 1. Rudnitsky argues that, pursuant to Rule 36, a party that fails to respond to Requests for Admission within 30 days is deemed to have admitted each requested fact. *Id*. at 4. Rudnitsky further argues that facts deemed admitted under Rule 36 may, by themselves, serve as a basis for the entry or summary judgment. *Id*. Rudnitsky attaches—as an exhibit to his Motion—Plaintiff's Requests for Admissions Pursuant to Federal Rule of Civil Procedure 36, Set 1, which he contends were unanswered. ECF No. [43-2]. Rudnitsky further filed

[1] Count VII was dismissed on May 12, 2026. *See* ECF No. [53].

a Statement of Material Facts in support of his Motion, to which ICAONA did not respond. ECF No. [43-1].

ICAONA responds that the 543 Requests for Admissions in this case were extraordinarily excessive, cumulative, argumentative, compound, burdensome, and disproportionate to the needs of the case, but nonetheless contends that it has now served responses and objections to the Requests for Admissions. ECF No. [53] at 2–3. ICAONA asks that any if any Requests for Admissions are deemed admitted, it be allowed to withdraw or amend its responses pursuant to Rule 36(b). *Id.* at 3. On July 1, 2026, Magistrate Judge Marty Fulgueira Elfenbein indicated that ICAONA had responded to the First Request for Production but served the responses without an attorney signature. *See* ECF No. [67].

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable

to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby, Inc.*, 477 U.S. at 252.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

## III. DISCUSSION

### A. Federal Rule of Civil Procedure 36

Under Federal Rule of Civil Procedure 36(a)(1), a party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within

the scope of Rule 26(b)(1). Under Rule 36(a)(3), a matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. Indeed, Rule 36(b) specifies that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."

Here, Rudnitsky served his first Requests for Admission on February 16, 2026. ECF No. [43-2] at 59. On July 1, 2026, Magistrate Judge Marty Fulgueira Elfenbein indicated as follows: "To date, Defendant has only responded to the First Request for Production but served the responses without an attorney signature." ECF No. [67]. Based on the Court's review of the applicable facts and law, three reasons support deeming admitted the matters in Plaintiff's Request for Admissions.

First, at no point has ICAONA filed a *motion* requesting leave to amend its response—as required under Rule 36(b). Instead, ICAONA requests in its Response to the Motion that if the Court determines that any Requests for Admissions are deemed admitted, the Court permit ICAONA to withdraw and/or amend such admissions. ECF No. [53] at 3. That is an improper mechanism for requesting leave to withdraw or amend such admissions.

Second, as ICAONA points out, that the Eleventh Circuit prefers to resolve disputes on the merits rather than upon procedural technicalities. *Id.* at 2. Rule 36(b) contemplates permitting withdrawal or amendment where doing so "would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Simultaneously, however, the United States Supreme Court has held that "[t]he Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000). Thus,

while district courts retain the inherent authority to manage their own dockets, *Wilson v. Farley*, 203 F. App'x 239, 250 (11th Cir. 2006), that broad authority is dictated by the binding nature of the Federal Rules of Civil Procedure. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 66 (1991) ("[T]he Federal Rules of Civil Procedure are 'as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule[s'] mandate than they do to disregard constitutional or statutory provisions.'") (citation omitted). Indeed, this circuit recognizes that attorneys are held to a higher "standard[] of compliance with formal or technical pleading rules[.]" *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980). And "[c]ourts in this circuit routinely treat unanswered or belatedly-answered requests as legally-conclusive admissions." *Nat'l Fire & Marine Ins. Co. v. Wells*, 301 F. Supp. 3d 1082, 1089 (N.D. Ala. 2018). To allow ICAONA to flout the Federal Rules of Civil Procedure without excuse, justification, or any attempt at correction would undermine the purposes of the Federal Rules of Civil Procedure.

Finally, the Court finds that allowing ICAONA to withdraw or amend its deficient responses at this late stage would prejudice Rudnitsky. ICAONA merely states that Rudnitsky "cannot demonstrate prejudice beyond being required to prove his claims through ordinary litigation procedures." ECF No. [53] at 2. That is not entirely accurate. To allow withdrawal or amendment would require Rudnitsky to operate well beyond the bounds of "ordinary litigation procedures." It would require Rudnitsky to engage once more in discovery proceedings after the close of discovery, *see* ECF No. [22], and to face additional time and expense as his attorneys potentially seek to re-draft a summary judgment motion at the close of the period for submitting dispositive motions. That constitutes substantial prejudice.

Thus, in this context, wherein ICAONA was delinquent in submitting responses at all, thereafter submitted an unsigned response, and has not affirmatively sought to correct its

mistake—indeed, ICAONA still does not attest that it could or would sign the response to the Request for Admissions, *see generally* ECF No. [53]—the Court finds that the matters in the Request for Admissions are deemed admitted.

**B. Summary Judgment**

Even where facts are deemed admitted, the Court's review of a motion for summary judgment is not over. Indeed, "the movant is not 'absolved . . . of the burden of showing that it is entitled to judgment as a matter of law[.]'" *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)). That is, the Court "must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]" *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (internal quotations omitted).

Here, Rudnitsky makes no arguments in his Motion as to why the elements of each Count are satisfied. *See generally* ECF No. [43]. Instead, much of his "argumentation" is found in his Statement of Material Facts, which attempts to align specific factual assertions with the elements of each cause of action. *See generally* ECF No. [43-2]. That is technically improper. However, ICAONA does not challenge Rudnitsky's presentation of his arguments or the sufficiency of any facts to support the causes of action asserted—instead, ICAONA's entire Response focuses on the Rule 36 issue. *See generally* ECF No. [53]. Moreover, the Court can easily discern the primary disputes between the parties and is otherwise equipped to apply the law to an admitted and circumscribed universe of facts. As such, the Court proceeds with its analysis of each cause of action, taking the facts contained in Rudnitsky's Request for Admissions as admitted.

#### i. Count I – Defamation

Under Florida law, the elements of defamation are: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B).

Additionally, defamatory statements are of a *per se* "character when, 'considered alone without innuendo,' they contain [ ] charges that a person has committed an infamous crime, or [ ] has contracted an infectious disease, or [ ] they carry statements tending to subject a person to hatred, distrust, ridicule, contempt or disgrace, or [ ] to injure a person in his trade or profession." *Adams v. News-Journal Corp.*, 84 So. 2d 549, 551 (Fla. 1955) (citing *Richard v. Gray, Fla.*, 62 So. 2d 597 (Fla. 1953)); *see also Harwood v. Bush*, 223 So. 2d 359, 361 (Fla. 4th DCA 1969). "In a *per se* action, the statements are 'so obviously defamatory' and 'damaging to reputation' that the injurious nature of the statement is apparent from the words in the statement itself[.]" *Paulson v. Cosm. Dermatology, Inc.*, No. 17-cv-20094, 2017 WL 2484197, at *3 (S.D. Fla. June 8, 2017) (citing *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)). That is, defamation *per se* gives rise to "an absolute presumption both of malice and damage." *Alan v. Wells Fargo Bank, N.A.*, 604 Fed. Appx. 863, 865 (11th Cir. 2015) (citing *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)).

Here, each element of a defamation claim or defamation *per se* claim is satisfied. The Court begins with a standard defamation claim regarding a private person. As to publication, ICAONA—through its representatives—disseminated to third parties, including the FMJD, statements accusing Plaintiff of fraud, forgery of signatures, and submission of false information. ECF No. [43-2] ¶ 139. Those statements were false. ECF No. [24] ¶¶ 24, 25. ICAONA acted at least

negligently insofar as it published the statements "without reasonable care to determine their falsity." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 804 (Fla. 1st DCA 1997) (citations omitted). The statements resulted in negative consequences, including the temporary removal of the MIAMI OPEN tournament from the FMJD calendar. ECF No. [43-2] ¶ 141.[2]

When construed as a defamation *per se* claim, the Court's conclusion remains the same. Those statements directly concern Rudnitsky's integrity and professional reputation, as ICAONA concedes. *Id.* ¶ 143. Indeed, accusations of forgery and fraud are widely held to be defamatory *per se*. *See Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1258 (S.D. Fla. 2021); *Jews For Jesus, Inc.*, 997 So. 2d at 1110 (Fla. 2008). Thus, the Court need not consider ICAONA's intent or any proof of damages, as both malice and damages are presumed. Fundamentally, there is no genuine dispute as to any material fact, and Rudnitsky is entitled to summary judgment as a matter of law as to Count I.

**ii. Count II – Tortious Interference with Business or Advantageous Relations**

"To prevail on a claim of tortious interference with a business relationship under Florida law, a plaintiff must establish four elements: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Pilkington v. United Airlines*, 112 F.3d 1532, 1540 (11th Cir. 1997); *see also Ethan Allen, Inc. v. Georgetown Manor,*

[2] Importantly, Rudnitsky asks the Court to "determine [ICAONA]'s liability for damages caused to [Rudnitsky], with the amount to be determined at a later stage of the proceeding." ECF No. [43] at 19. "A plaintiff moving for summary judgment as to liability only does not need to prove the specific amount of damages to prevail." *AmeriPath, Inc. v. Wetherington*, No. 10-60766-CIV, 2011 WL 1303804, at *5 (S.D. Fla. Apr. 4, 2011). Indeed, even "[c]onflicting evidence as to amount of damages does not raise a genuine issue as to liability." *Id*. Thus, the Court does not require Rudnitsky to quantify the damage stemming from the removal of the MIAMI OPEN tournament from the FMJD calendar.

*Inc.*, 647 So. 2d 812, 814 (Fla. 1994). "Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action." *Pilkington*, 112 F.3d at 1540; *see also Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976). "The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Pilkington*, 112 F.3d at 1540; *see also In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1200 n.22 (S.D. Fla. 2022).

Importantly, "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc.*, 647 So. 2d at 815; *see also ISS Cleaning Services Group, Inc. v. Cosby*, 745 So. 2d 460, 462 (Fla. 4th DCA 1999) (holding the same for a "tortious interference with a prospective business relationship"). While an enforceable contract need not exist, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc.*, 647 So. 2d at 814 (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)). Where no contract exists, a plaintiff must "advance some evidence" that a contract would have been entered into absent the defendant's intervention. *Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1259 (M.D. Fla. 2012).

Here, the Court finds that Rudnitsky has satisfied his burden. He has shown a business relationship with the FMJD with which ICAONA interfered by, among other things, communicating with the FMJD to demand the removal of the MIAMI OPEN from its calendar and demanding that Rudnitsky be barred from the 2025 World Championship. ECF No. [43-2] ¶¶ 140–158.[3] ICAONA did so specifically to cause Rudnitsky to stop developing his "illegitimate"

---

[3] Importantly, ICAONA merely urging players not to participate in the 2025 MIAMI OPEN does not constitute tortious interference. ECF No. [43-2] ¶¶ 149–52. "Competition for business is not *per se* an

organization. *Id.* ¶ 158. As a result of ICAONA's actions, Rudnitsky suffered damages, including the exclusion of his 2025 MIAMI OPEN from the FMJD calendar for more than a month. *Id.* ¶ 141. Those facts are sufficient to establish ICAONA's liability, and summary judgment is granted in favor of Rudnitsky on Count II.

**iii. Count III – Breach of Fiduciary Duty**

In Florida, the elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1338 (S.D. Fla. 2011), *aff'd*, 483 F. App'x 568 (11th Cir. 2012) (citation omitted); *see Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002) ("The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages."). There is a fiduciary relationship when confidence "is reposed by one party and a trust accepted by the other." *Williams v. Hunt Bros. Constr., Inc.*, 475 So.2d 738, 741 (Fla. 2d DCA 1985). A plaintiff alleging a breach of fiduciary duty "must bring forth substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." *Swerhun v. Gen. Motors Corp.*, 812 F. Supp. 1218, 1223 (M.D. Fla. 1993) (citations omitted); *see also Doe v. Young Men's Christian Ass'n of Suncoast, Inc.*, No. 2D2024-1900, 2026 WL 1354922, at *4 (Fla. 2d DCA May 15, 2026), *reh'g denied* (July 30, 2026) ("All fiduciary relationships to some degree, [require] confidence of one in another and a certain inequity or

---

actionable interference even though it is intentional." *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980). Indeed, "the competition privilege allows competition not to be characterized as tortious interference as long as Plaintiffs did not employ improper means to interfere with the business relationship[.]" *Deman Data Sys., LLC v. Schessel*, No. 8:12-CV-2580-T-24, 2014 WL 6751195, at *29 (M.D. Fla. Dec. 1, 2014), *amended on reconsideration*, No. 8:12-CV-2580-T-24, 2015 WL 58650 (M.D. Fla. Jan. 5, 2015). Thus, ICAONA merely encouraging third parties not to do business with Rudnitsky's organization, without more, is not tortious interference—and Rudnitsky does not point to evidence that ICAONA did more.

dependence arising from weakness of age, mental strength, business intelligence, knowledge of facts involved, or other conditions which give one an advantage over the other." (quoting *Doe ex rel. Doe v. Abusahyoun*, 67 Conn. L. Rptr. 242 (Conn. Super. Ct. 2018))). And importantly, "one may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created." *Suzmar, LLC v. First Nat'l Bank of S. Miami*, 388 So. 3d 852, 855 (Fla. 3d DCA 2023) (quoting *Silver*, 760 F. Supp. 2d at 1339).

Here, Rudnitsky has not adequately shown the existence of a fiduciary duty on ICAONA's part. He certainly shows that ICAONA controlled his membership, participation in competitions, and professional activities. ECF No. [43-1] ¶ 14. But that is no different than a university, which controls students' enrollment and participation in activities, and even universities do not take on a fiduciary duty simply because of students' status as students, *Morrison v. Univ. of Miami*, No. 1:15-CV-23856-UU, 2016 WL 3129490, at *7 (S.D. Fla. Jan. 20, 2016). None of Rudnitsky's factual assertions show, beyond any dispute, that ICAONA consciously accepted any particular duties toward him or that the types of inequity or dependence contemplated by Florida law existed. There are certainly no facts suggesting that ICAONA undertook to "advise, counsel, and protect" Rudnitsky as an individual. Indeed, the law is clear that even where an organization holds itself out as adhering to certain policies and standards, it does not necessarily follow that the organization has taken on a fiduciary duty. *Id.* Thus, summary judgment is denied as to Count III.

**iv. Count IV – FDUTPA**

The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat §§ 501.201 *et seq.* ("FDUTPA"), prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To prove a FDUTPA violation, "a plaintiff must show (1) a deceptive act or unfair

trade practice, (2) causation, and (3) actual damages." *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 626–27 (11th Cir. 2015) (citing *Dolphin LLC v. WCI Cmties., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)). An act or practice is defined as deceptive if it "'is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Millennium Commc'ns & Fulfill., Inc. v. Office of the Att'y Gen.*, 761 So.2d 1256, 1263 (Fla. 3d DCA 2000) (quoting *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1434–35 (9th Cir.1986)). An unfair practice, in turn, is defined as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (internal quotations omitted). FDUTPA damages are measured by the difference in market value between what was received and what should have been received. *Id.* (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984)).

The Court is satisfied that ICAONA's actions fall within FDUTPA's broad definition of "trade or commerce." The statute defines those terms, in relevant part, as "the advertising, soliciting, providing, offering, or distributing . . . of any good or service," and it expressly includes not-for-profit activity. Fla. Stat. § 501.203(8). Thus, a non-profit's activities fall squarely within FDUTPA's scope.

Moreover, the undisputed facts, drawn from the admitted items in the Request for Admissions, show unfair trade practices. For instance, ICAONA imposed upon Rudnitsky—as a precondition to his participation in competitions—the requirement that he abandon his lawsuit and withdraw all complaints to the FMJD Executive Committee and FMJD Ethics Committee. ECF No. [43-2] ¶¶ 391–93. That plainly falls within FDUTPA's prohibition on unfair methods of competition, unconscionable acts, and on acts that offend "established public policy" and are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Natural*

*Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1235, 1333 (11th Cir. 2008). Furthermore, as established above, ICAONA disseminated false accusations to third parties in an effort to exclude Plaintiff and preclude the development of his new organization. *Id.* ¶¶ 13 –43, 155–60. "Intentionally making false statements to a competitor's customers"—in this case, to the FMJD—"is clearly barred by the FDUTPA because it is an unethical practice that offends public policy." *Institutional Deposits Corp. v. Pac. Coast Bankers' Bank*, No. 09-23253-CIV, 2010 WL 11601557, at *4 (S.D. Fla. May 12, 2010) (citation omitted). Finally, the facts demonstrate that ICAONA effectively forced U.S. players to join ICAONA as the only way to participate in the U.S. National Championship and obtain international qualification, which directly contravenes the FMJD's statement that "every player registered in the FMJD database must have the opportunity to participate in the U.S. National Championship." *Id.* ¶¶ 204–206, 218. That constitutes a plainly unfair method of restricting competition from alternative organizations.

As a result of ICAONA's actions, the MIAMI OPEN tournament was temporarily removed from the FMJD calendar and Plaintiff was denied access to certain competitions. *Id.* ¶¶ 141, 178–179, 404–07, 487, 491. Plaintiff further suffered "serious moral and reputational harm," *id.* ¶ 188, and the loss of opportunity to compete created "substantial and irreparable" for him, including the risk of ending his sporting career. *Id.* ¶¶ 419–20, 427.

The above actions and their effects constitute FDUTPA violations and summary judgment is granted as to Count IV.

**v. Count V – Civil Conspiracy**

To prove a civil conspiracy, a plaintiff must show: "(1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) the execution of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of said acts." *Plastiquim S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. 3d DCA 2022) (citing

*Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)). To establish civil conspiracy, the plaintiff must point to "an actionable underlying tort or wrong." *Id*. That is because "[t]here is no freestanding cause of action in Florida for 'civil conspiracy.'" *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019). Rather, "[t]he conspiracy is merely the vehicle by which the underlying tort was committed, and the allegations of conspiracy permit the plaintiff to hold each conspirator jointly liable for the actions of the coconspirators." *Id*. Importantly, agreements in the civil conspiracy context may be established by circumstantial evidence. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). For instance, "[p]roof that the [defendant] committed an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence [that can] prove the existence of [an] agreement." *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006).

Here, Rudnitsky points to actions taken by ICAONA Executive Director Turiy, ICAONA President R. Azimullah ("Azimullah"), and the ICAONA Board that indicate an agreement to do unlawful acts. For instance, the memorandum demanding that Rudnitsky abandon his lawsuit and conditioning his access to the 2025 U.S. Championship on his acceptance of all conditions was signed by both Turiy and Azimullah. ECF No. [43-2] ¶¶ 385–93. The ICAONA Board voted on the conditions of the memorandum. *Id.* ¶ 409. Furthermore, Rudnitsky has established that ICAONA *and its officers* amended its Charter to cause him (and him alone) to be designated an "inactive member," notwithstanding that he was one of ICAONA's most active members from 2002 to 2024, resulting in his disqualification from competition. *Id.* ¶¶ 173–81, 190–92, 195–96. Furthermore, ICAONA amended its Bylaws in 2025 to prohibit "any actions that may cause harm to ICAONA members or the organization as a whole," ECF No. [24-5] ¶ 4.1(b)(iii), and applied that provision to disqualify Rudnitsky based on his creation of NDF with the purpose of

"restricti[ing] [] Rudnitsky's influence on the development of draughts in the United States." ECF No. [43-2] ¶¶ 95–115, 128. Finally, ICAONA, through the official actions of Turiy, addressed the FMJD with false accusations against Rudnitsky.

Those actions readily support the finding of an agreement between ICAONA's leadership to inflict unlawful harm on Rudnitsky. At a minimum, they represent overt acts taken to tortiously interfere with Rudnitsky's business relationships with the FMJD—both as an individual and through NDF—to violate FDUTPA by unfairly competing with Rudnitsky's organization and treating Rudnitsky in a manner contrary to public policy, and to defame Rudnitsky. As a result of those actions, Rudnitsky suffered damages including the exclusion of NDF from the FMJD calendar for more than a month, reputational damage, and damage to his sporting career. *Id.* ¶¶ 141, 143, 276, 383, 405, 541.

Taken as a whole, those facts are sufficient to establish a civil conspiracy among ICAONA leadership to, at a minimum, tortiously interfere, violate FDUTPA, and defame Rudnitsky. Thus, summary judgment is granted as to Count V.

**vi. Count VI – Violation of Federal Antitrust Laws (Sherman Act, 15 U.S.C. §§ 1–2; Clayton Act, 15 U.S.C. § 15)**

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits monopolizing, attempting to monopolize, or conspiring to monopolize "any part of the trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 2. On its own, the Sherman Act does not provide a private right of action. *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1287 (S.D. Fla. 2018). However, Section 4 of the Clayton Act creates a

private right of action for any person who is injured in his "business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15(a).

In suing under the Clayton Act to reach a Sherman Act violation, "courts require parties to show that they are the proper plaintiffs to vindicate the public's interest in enforcing the antitrust laws." *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010). This is referred to as "antitrust standing," *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1273 (11th Cir. 2015), and the basic goal is to ensure "effective enforcement of the antitrust laws" even where conduct cannot be reached based on Article III's "case and controversy" standing. *Palmyra*, 604 F.3d at 1299 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) ). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov*, 921 F.2d at 1448 (citations omitted).

To show antitrust standing, the Eleventh Circuit has instructed that a plaintiff must show, first, a violation of antitrust laws resulting in "antitrust injury," defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The goal is to ensure that the plaintiff, while motivated by his own private interests, is nonetheless seeking to "vindicate the type of injury to the public that the antitrust laws were designed to prevent." *Palmyra*, 604 F.3d at 1299 (citing *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990)).

Second, the plaintiff must show that he is an "efficient enforcer" of the antitrust laws, *Palmyra*, 604 F.3d at 1299—that is, that he "will efficiently vindicate the goals of the antitrust laws." *Todorov*, 921 F.2d at 1452. In assessing this second prong, courts consider, among other

things: "the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs are better suited to vindicate the harm, whether the damages are highly speculative, the extent to which the apportionment of damages is highly complex and would risk duplicative resources, and whether the plaintiff would be able to efficiently and effectively enforce the judgment." *Sentry Data Sys., Inc.*, 361 F. Supp. 3d at 1288. (citations omitted).

Here, Rudnitsky has shown a violation of the Sherman Act, vindicated by way of the Clayton Act. As an initial matter, Rudnitsky has shown an antitrust injury—specifically, a conspiracy to restrict national and international competition in sports in violation of Section 1 of the Sherman Act and an attempt to monopolize the market for official checkers competitions within the United States in violation of Section 2 of the Sherman Act. For instance, in the regulations for the 2025 U.S. OPEN, ICAONA stated that a U.S. citizen or lawful resident who otherwise meets appropriate sporting criteria but is not a member of ICAONA would not be admitted to the U.S. National Championship. ECF No. [43-2] ¶ 215. That means that independent players, players of other legally existing organizations, and players who do not join ICAONA are "automatically deprived of national status and are not admitted to compete in the U.S. National Championship for the title of U.S. Champion or the right to represent the country internationally." *Id.* ¶ 216. Put simply, ICAONA excluded non-members from the U.S. National Championship and from obtaining international qualification. *Id.* ¶ 218. Furthermore, ICAONA admitted that those rules were "adopted for the purpose of establishing exclusive control over national ranking and qualification pathways for participation by U.S. citizens and lawful U.S. residents in international draughts competitions in the United States and abroad, and over the right to represent the United States internationally." *Id.* ¶ 220. Moreover, ICAONA admitted that its proposal to disqualify Rudnitsky and its decision to bar Rudnitsky from the 2025 World Championship were rooted in a

"desire for Rudnitsky to stop developing his 'illegitimate' organization." *Id.* ¶ 158. Those actions—forced membership, suppression of alternative organizations, and limitation of independent tournaments—violate Section 1 and Section 2 of the Sherman Act and constitute an antitrust injury.

Moreover, Rudnitsky is an "efficient enforcer" of the antitrust laws. His injuries have been direct—that is, exclusion of NDF's tournament from the FMJD calendar for more than a month, reputational damage, and damage to his sporting career. *Id.* ¶¶ 141, 143, 276, 383, 405, 541. Insofar as Rudnitsky's disqualification is the only instance of applying ICAONA's prohibition on outside organizational activity, *id.* ¶ 114, and Rudnitsky was the only person against whom sanctions were applied under the updated Charter, *id.* ¶ 176, he is uniquely suited to vindicate the harm at issue here. Moreover, the apportionment of damages would be straightforward Those reasons counsel in favor of finding that Rudnitsky is an efficient enforcer, as contemplated by the Eleventh Circuit.

Thus, the Court finds that Rudnitsky has carried his burden, and summary judgment is granted as to Count VI.

**vii. Count VIII – Declaratory Relief**

"The declaratory judgment is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy and an adjudication would serve a useful purpose." *DDFA of S. Fla., Inc. v. Dunkin' Donuts, Inc.*, No. 00-7455, 2002 WL 1187207, at *4 (S.D. Fla. May 22, 2002) (quoting *Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 445 F.2d 1278, 1280 (5th Cir. 1971)). "A declaratory judgment should be granted (1) when the judgment will serve a *useful purpose* in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Id.* (quoting *Cont'l Casualty Co. v. Coastal Sav. Bank*,

977 F.2d 734, 737 (2d Cir. 1992); *McGraw Edison Co. v. Performed Line Prods. Co.*, 362 F.2d 339, 342 (9th Cir. 1966)) (emphasis in original).[4]

Importantly, courts "may properly refuse declaratory relief if the alternative remedy is better or more effective." *Angora Enters., Inc. v. Condo. Ass'n of Lakeside Vill., Inc.*, 796 F.2d 384, 388 (11th Cir. 1986) (quotation omitted). Moreover, where a decision on the merits of the plaintiff's claims "fully addresses the parties' rights and obligations[,]" *Glob. Monetization Partners, LLC v. Sierra Madre Dev., LLC*, No. 24-23926-CIV, 2025 WL 1517464, at *3 (S.D. Fla. Apr. 22, 2025), the request for declaratory judgment is rendered "moot or redundant." *Schell v. Amendia, Inc.*, No. 17-cv-02761, 2019 WL 5617980, at *8 (N.D. Ga. Oct. 31, 2019) (citation omitted). Fundamentally, "[a] district court should not grant a declaratory judgment unless such adjudication would serve a useful purpose." *Blue Hill Investments, Ltd. v. Silva*, No. 1:15–CV–20733–KMM, 2015 WL 9319394 at *3 (S.D. Fla. Dec. 23, 2015) (citing *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009)).

The Court does not find declaratory relief to be warranted here. In the Motion, Rudnitsky requests that the Court "adjudge Defendant's actions, including Plaintiff's disqualification, unlawful and invalid both for failure to comply with required procedures and on the merits, and declare such disqualification void and without legal effect[.]" ECF No. [43] at 19. But for one, the Court did not pass any judgment on ICAONA's adherence to or divergence from any of its own procedures. Nor could the Court do so, as Florida does not recognize a private cause of action for an organization's failure to comply with its own internal policies, unless the failure is tied to a

[4] Florida law is not substantially different. It requires a plaintiff to show that there is "'bona fide, actual, present practical need for the declaration . . . and that the relief sought is not merely giving of legal advice by the courts.'" *Orange Cty. v. Expedia, Inc.*, 985 So.2d 622, 625–26 (Fla. 5th DCA 2008) (quoting *Palumbo v. Moore*, 777 So.2d 1177, 1178 (Fla. 5th DCA 2001)).

statutory or contractual obligation. *See Muller v. Stromberg Carlson Corp.*, 427 So. 2d 266 (Fla. 2d DCA 1983).

Moreover, it is unclear what useful purpose a declaratory judgment would serve beyond that which is already provided by the Court's adjudication of the Counts and resolution of the injunctive relief request below. "[T]he legal rights that [Rudnitsky] seeks to vindicate through its declaratory judgment claim are entirely resolved by" his substantive claims. *BASF Corp. v. L&M Collision, Inc.*, No. 4:24-CV-216, 2026 WL 1046731, at *5 (S.D. Ga. Apr. 17, 2026) (citing *BASF Corp. v. Custom Coach, Inc.*, No. 24-62127-CIV, 2025 WL 1191092, at *3 (S.D. Fla. Mar. 24, 2025)). Declaratory relief "would serve no practical purpose." *Custom Coach, Inc.*, 2025 WL 1191092, at *3. Thus, the Court declines to issue a declaratory judgment, and summary judgment is denied as to Count VIII.

**viii. Count IX – Injunctive Relief**

Permanent injunctive relief is appropriate only where a plaintiff demonstrates: (1) he has suffered irreparable harm; (2) there is no adequate remedy at law; (3) the balance of hardships favors an equitable remedy; and (4) issuance of an injunction is in the public's interest. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391–92 (2006). Importantly, "there is no irreparable harm where money damages may compensate the loss—[that is], where an adequate remedy at law exists." *Finalca Casa De Bolsa, C.A. v. Bank of Am., N.A.*, No. 10-20306-Civ, 2010 WL 1540050, at *5 (S.D. Fla. Apr. 19, 2010) (citations omitted); *see also FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1212 (S.D. Fla. 2011) ("The ability of a plaintiff to recover money damages as an adequate remedy for losses suffered precludes a finding of irreparable harm." (citation omitted)).[5]

[5] Similarly, "[t]o obtain a permanent injunction under Florida law, a plaintiff must 'establish a clear legal right [to the relief requested], an inadequate remedy at law, and that irreparable harm will arise absent

Rudnitsky has pointed to an ongoing harm in the form of exclusion from the U.S. Championship, loss of qualification and international opportunities, and reputational and professional harm. ECF No. [43-2] ¶¶ 178–88, 404–07, 473–91. ICAONA's November 2025 letter threatened to deprive Rudnitsky of the opportunity to participate in official competitions for a period of two to three years if he did not comply with ICAONA's demands, a loss that would be "substantial and irreparable for a professional athlete." ECF No. [43-2] ¶¶ 418, 420. Indeed, ICAONA admitted that Rudnitsky's non-participation in the 2026-27 competition cycle "would in fact mean the end of his sporting career." *Id.* ¶ 427. These facts represent both past and future irreparable harms. Even the reputational harms experienced by Rudnitsky alone would qualify as irreparable—"[c]ourts have held that the threatened damage to goodwill and reputation . . . constitutes irreparable harm warranting injunctive relief." *CB Member LLC v. Hutchison*, No. 25-CV-22629, 2025 WL 2829735, at *2 (S.D. Fla. June 12, 2025) (collecting cases).

Moreover, Rudnitsky has demonstrated that the harms he has faced and continues to face are not compensable monetarily, "as participation in the U.S. Championship constitutes a unique opportunity necessary for international qualification, and denial of participation automatically deprives Plaintiff of the ability to represent the United States at the international level." ECF No. [43-1] ¶ 54. Indeed, the Eleventh Circuit has stated: "When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored." *Allen v. Autauga Cnty. Bd. of Educ.*, 685 F.2d 1302, 1306 (11th Cir. 1982). Similarly, Rudnitsky's disqualification—done for purposes of tortiously interfering with his business relationship with the FMJD, in violation of

---

injunctive relief.'" *Cnty. of Monroe, Fla. v. Priceline.com, Inc.*, No. 09-10004, 2009 WL 4890664, at *6 (S.D. Fla. Dec. 17, 2009) (quoting *Liberty Counsel v. Fla. Bar Bd. of Governors*, 12 So. 3d 183, 186 n.7 (Fla. 2009)).

FDUTPA, as part of a civil conspiracy, and in violation of federal antitrust laws—amounts to a total exclusion from his line of work, a harm not easily compensable monetarily.

The balance of hardships favors Rudnitsky, as "compliance with federal law is [not] an onerous burden[.]" *Singleton v. Allen*, 691 F.Supp.3d 1343, 1356 (N.D. Ala. 2023). By contrast, Rudnitsky's ongoing exclusion from his profession is a grave hardship.

Finally, the public interest is served by enjoining ICAONA's actions insofar as they violate the law. For instance, "the public is interested in fair competitive practices[.]" *GMC v. Phat Cat Carts, Inc.*, 504 F. Supp. 2d 1278, 1280, 1288 (M.D. Fla. 2006). Similarly, "[e]njoining [the d]efendants from . . . engaging in tortious interference, unfair competition, and . . . from making false and defamatory statements . . . serves the public's interest." *Fam. First Life, LLC v. Rutstein*, No. 22-80243-CIV, 2023 WL 2866554, at *11 (S.D. Fla. Jan. 30, 2023).

Thus, Rudnitsky is entitled to injunctive relief. In detailing the sought injunctive relief, Rudnitsky asks the Court to:

> order Defendant to cease application of the challenged disciplinary and exclusionary measures, including the discriminatory practice of denying Plaintiff and other non-members of ICAONA participation in the U.S. National Championship, and to remedy the consequences of such actions, including:
>
> - restoration of Plaintiff's status in ICAONA and rights to play in any events under the auspices of ICAONA;
> - restoration of his right to participate in official competitions, including the U.S. Open Championship, without ICAONA's restrictions[.]

ECF No. [43] at 19.

The Court finds the requested relief reasonable and narrowly related to the violations identified in this Order. However, the Court finds the language of "challenged disciplinary and exclusionary measures" too amorphous to serve as effective injunctive relief, so the Court will strike that language. Moreover, the Court finds certain additional specificity warranted and will modify the proposed injunctive relief accordingly. *See Cohen v. Monroe Cty.*, 749 F. App'x 855,

859 (11th Cir. 2018) (explaining that the precise form of injunctive relief "lies in the discretion of the district court") (citations omitted)). As modified, the Court will order this injunctive relief once it enters judgment in this case.

**ix. Count X – Severe Emotional Distress**

It is not clear what cause of action Rudnitsky seeks to assert in Count X, as he does not cite to any legal authority in support of his claim. The language of "severe emotional distress" typically arises in claims focusing on infliction of emotional distress, but no such claim is asserted here. Instead, Rudnitsky merely asserts that "[t]he admitted facts and submitted medical evidence confirm the existence of substantial emotional distress directly caused by Defendant's actions." ECF No. [43-1] ¶ 60. Insofar as there does not exist a standalone cause of action for "severe emotional distress," the Court denies summary judgment on this Count.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Rudnitsky's Motion, **ECF No. [43]**, is **GRANTED IN PART AND DENIED IN PART**.
2. Summary judgment is granted in favor of Rudnitsky as to **Counts I, II, IV, V, VI, and IX**. Summary judgment is denied as to **Counts III, VIII, and X**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 14, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record